**HOME SAVINGS AND LOAN, a Utah corporation, Plaintiff and Appellee,**

v.

**The AETNA CASUALTY AND SURETY COMPANY, Defendant and Appellant.**

**No. 890101–CA.**

Court of Appeals of Utah.

Aug. 6, 1991.

---

Lynn S. Davies (argued) and Russell C. Fericks, Richards, Brandt, Miller & Nelson, Salt Lake City, for defendant and appellant.

Gary R. Howe, P. Bryan Fishburn (argued) and Scott A. Call, Callister, Duncan & Nebeker, Salt Lake City, for plaintiff and appellee.

Before BENCH, BILLINGS and GREENWOOD, JJ.

## OPINION

GREENWOOD, Judge:

Aetna Casualty and Surety Company appeals the trial court's ruling that a loss incurred by Home Savings and Loan was covered by a fidelity bond issued to Home by Aetna. Home made a total of forty-two second mortgage loans to individuals (AFCO investors) who had been referred to Home by Grant Affleck. The loan proceeds were invested in AFCO, which was controlled by Affleck. Following the financial demise of Affleck and AFCO, the AFCO investors brought suit against Home because of its involvement with AFCO. Home lost the lawsuit and was ordered to return the second mortgage notes and trust deeds to the AFCO investors, foregoing, as a result, any further collection on the loans. Home thereby incurred a significant loss which it claims was covered by Aetna's fidelity bond. Aetna denied coverage and Home brought this suit. Following a jury trial, the trial court ruled that Home's loss was covered by the Aetna bond. We affirm.

## FACTS

During 1981, Affleck arranged for several lending institutions to issue second-mortgage loans to people who were interested in investing in AFCO. AFCO sought this financing because it was experiencing critical cash flow problems and lending institutions would not lend to AFCO directly.

In November of 1981, Affleck arranged for Home to grant second-mortgage loans to potential AFCO investors. Affleck delivered the investors' loan applications to Home and indicated that the applicants had been rejected by other lending institutions because those institutions had reached their lending caps. Bill Cox, vice president of Home's mortgage department, asked Larry Glad, the loan solicitor who brought Affleck to Home, to contact all of the applicants to see if they were still interested in obtaining a loan and to verify that the information contained in the applications was correct. Two days later, Glad reported that all of the applicants were still interested. Glad then began to process the loan applications. Home claims that Glad altered loan applications to increase the income, credit, and home equity of the AFCO investors so that they would qualify for larger loans. Home also claims that while processing the loan applications Glad caused unauthorized persons to sign some of the loan documents.

Affleck pressured Home personnel to approve the loans quickly. One of Affleck's employees was even "loaned" to Home in order to expedite the approval process. Home claims to have given Glad and Elaine Reese, a loan closer for Home, specific instructions to make sure that one of them was present at every loan closing. Glad, however, gave the loan documents to Affleck and Affleck closed the loans himself without any Home employee being present.

One of the closing documents was a notice of the borrower's right to rescind the loan at any time within three days of the closing. Reese, on Glad's instruction, backdated the rescission notices and other closing documents in order to expedite the disbursement of the loans. The backdating was intended to create the illusion that the borrowers' right to rescind had expired on or before the day the loan was actually closed. Home was thereby able to disburse the loan proceeds on the same day as the closing.

In mid-December 1981, Home learned that Glad had engaged in dishonest and fraudulent acts unrelated to the AFCO investor loans. Included in these acts was Glad's receipt of a kickback on a loan made directly to AFCO, a loan that AFCO eventually repaid. Glad was promptly terminated effective December 29, 1981. Following Glad's departure, Home closed several more second mortgage loans to AFCO investors.

On January 28, 1982, AFCO issued a check to Home, to be applied toward the first monthly payments due on the AFCO investor loans. Although it was contrary to Home's usual policy to accept third-party repayments of its loans, AFCO and its investors had apparently made this arrangement. However, when Home attempted to cash the check, it was returned due to insufficient funds in AFCO's account.

On February 26, 1982, Affleck sent a letter to Home requesting additional time to bring the second mortgage loans current. He informed Home that there were potential problems with the loans because the loan documents had been backdated in order to eliminate the right of the AFCO investors to rescind the loans. He also informed Home that he had closed the loans personally without any Home employee being present. Affleck requested the extension in order to avoid "any direct legal action from individuals that have taken out the above referenced 2nd mortgage loans."

On March 8, 1982, AFCO filed for bankruptcy. At Home's board of directors' meeting held on March 17, 1982, Home's legal counsel indicated to the board that Home's position was sound despite AFCO's bankruptcy because of the "documentation of the loans."

In April 1982, approximately three hundred plaintiffs filed a complaint in the United States Bankruptcy Court against Affleck, AFCO, and numerous other defendants, including Home and sixteen other lending institutions that had made similar second mortgage loans to AFCO investors. The complaint, designated as *Alcorn, et al. v. Grant Affleck, et al.*, was served upon Home on April 13, 1982. The complaint listed numerous irregularities in the loans and sought an order declaring the notes and second mortgage trust deeds void, and an order barring the financial institutions involved from demanding repayment of loans made to the AFCO investors.[1]

The Federal Home Loan Bank Board conducted an examination of Home which indicated that as of June 4, 1982, Home was already scheduling the second mortgage loans as being at risk. The examiner concluded that "[t]hese loans represent a potential for losses and/or large legal expenses to the institution." After discussing the *Alcorn* lawsuit then pending in bankruptcy court, the examiner made the following observation in its report: "[Home's] Management expects that there will be further attempts to frustrate the foreclosures [of the second mortgage trust deeds] by challenging the validity of the documentation and underwriting."

In May 1982, an Aetna insurance agent approached Home with the proposition that Home replace its savings and loan blanket bond, issued by Fidelity and Deposit Company of Maryland (F & D), and due to expire June 21, 1982, with an Aetna bond. Home completed an Aetna application form that asked, among other things, whether Home had sustained any insurable losses within the past five years. Home truthfully responded that it had sustained no such losses over the $5000 deductible amount. On July 14, 1982, the sale of the Aetna bond to Home was completed. The bond was a Standard Form 22 bond, identical in form and language to the F & D bond it replaced. It provided for coverage in a principal amount of up to $1,135,000 for a period of three years from June 21, 1982, to June 20, 1985.[2] Home and Aetna subse-

---

**1.** Home also received other notification, in the form of lawsuits and letters from attorneys, of alleged improprieties in the AFCO investor loan processing and the investors' intent to avoid repayment of those loans. This notification was received in March and April 1982.

**2.** The bond's effective date was made retroactive in order to provide Home with continuous cov-

quently agreed to extend the coverage period through August 20, 1986.

The bankruptcy court abstained from hearing the *Alcorn* complaint as part of the AFCO bankruptcy. It therefore dismissed the *Alcorn* complaint on July 2, 1982. The complaint was refiled, in essentially the same form, in federal district court on the same day as *Abbott, et al. v. Shaffer, et al.* The action was then severed into several different lawsuits each naming a particular financial institution as defendant. The lawsuit relating to Home involved thirty-six loans and was styled as *Armitage v. Home Savings and Loan.*

On December 9, 1982, counsel for Home sent a letter to Aetna giving formal notice of the claims being made by the AFCO borrowers in the *Armitage* case. In the notice letter, Home's counsel indicated that discovery in the *Armitage* case had uncovered the likelihood of dishonesty of Home employees in processing the AFCO investor loans, creating the likelihood that if Home lost the case, such loss would fall within the bond's fidelity loss coverage. Aetna then began monitoring the case.

On September 30, 1983, Aetna elected to not assume defense of the *Armitage* litigation. Aetna gave three reasons for this decision. First, Aetna claimed its bond would not cover losses sustained during the coverage period of the F & D bond it replaced, except to the extent that such losses exceeded the F & D coverage amount.[3] Second, Aetna concluded that the borrowers' claims in the various complaints were attributed to acts of Home employees that were committed "at the direction of and for the benefit of Home Savings." Such acts did not fall within the bond's definition of employee dishonesty and, therefore, even if proven, would not fall within the fidelity coverage of the bond. Third, Aetna stated, "it appears that many of the claims may have been discovered prior to 6–21–82, the date on which this bond was issued."

Nearly a year later, on August 14, 1984, the *Armitage* jury returned special verdicts against Home. Judgment in the case was entered on February 24, 1986. Pursuant to the judgment, Home was barred from foreclosing on the second mortgage trust deeds and from seeking any recovery of its loans to the AFCO investors. Home's Aetna bond was still in effect at that time.

Home sought indemnification under the Aetna bond for the *Armitage* loss, claiming that the loss was the direct result of the dishonesty of its former employee, Larry Glad, and was, therefore, covered by the Aetna bond. Aetna responded that the loss was not covered under the terms of the bond and refused to indemnify Home. Home then brought this lawsuit.

Aetna moved for summary judgment, claiming that the *Armitage* loss was not covered by the bond because it was "discovered" prior to the period of coverage provided by the bond. In response, Home moved for a court order construing the "discovery" language of the bond to mean the discovery of an actual loss sustained and not the discovery of a potential loss. The trial court denied Aetna's motion for summary judgment concluding, as a matter of law, that "discovery of a loss" necessarily meant the discovery of a "loss sustained." The trial court reasoned that even though Home may have known about Glad's dishonesty earlier, it could not have discovered a "loss sustained" until the *Armitage* jury rendered its verdict on August 14, 1984, which event occurred within the coverage period of the bond. The trial court then granted Home's motion for an order construing the Aetna bond and ruled that "plaintiff sustained a 'loss,' as the term 'loss' is contemplated in the Aetna Bond, on August 14, 1984. Accordingly, plaintiff discovered its 'loss sustained' during the period the Aetna Bond was in effect."

erage following the expiration of the F & D bond.

**3.** Aetna apparently assumed that the loss was sustained when the loans were made. As dis-

cussed more fully in our treatment of Aetna's argument as to when the loss was discovered, this assumption was not correct.

Trial of this dispute lasted over four weeks in October and November 1987. By special verdict, the jury found that Home's loss on thirty-four of the thirty-six loans voided by the *Armitage* lawsuit was caused by the dishonest conduct of Glad, that Glad's dishonesty was first discovered by Home in mid-December 1981, and that the dishonesty discovered at that time was unrelated to the AFCO investor loans. By special interrogatory, the jury also found that Home had unintentionally failed to inform Aetna of facts that would have prevented Aetna from issuing the bond during the bond application process.

The trial court interpreted the special verdict and special interrogatory findings to be in favor of Home and granted judgment against Aetna. Under the judgment, Aetna was ordered to pay the principal lost on the thirty-four dishonestly processed loans, less the bond's $5000.00 deductible, totaling $889,812.46; legal costs awarded to the *Armitage* plaintiffs against Home of $190,647.31; legal costs incurred by Home in defending the *Armitage* suit of $437,-500.00; and interest and court costs related to this case and the *Armitage* case.

Aetna raises seven arguments on appeal: [4] (1) because Glad's dishonesty was known to Home before the Aetna bond went into effect, the bond never covered losses caused by any of Glad's dishonest conduct; (2) Home discovered its loss prior to the time the Aetna bond went into effect, and therefore the loss is not covered; (3) Home's failure to inform Aetna of the problems with the AFCO investor loans in the bond application voids coverage; (4) because the loss was related to trading in securities, it is excluded from the bond's coverage; (5) the jury instructions improperly prevented the jury from finding that Home's loss was caused by its own mismanagement and poor judgment rather than by Glad's dishonesty; (6) Home's loss was improperly calculated, in that certain of the loan outlays were returned to Home; and (7) Home should not recover the legal costs awarded against it in the *Armitage* case, nor all of its own legal costs incurred in defending that case.

## STANDARD OF REVIEW—INSURANCE CONTRACT INTERPRETATION

■ The interpretation of a contract normally presents a question of law. *Village Inn Apartments v. State Farm Fire and Casualty Co.*, 790 P.2d 581, 582 (Utah App. 1990). We regard the Aetna bond as a contract for insurance, and therefore give no particular deference to the trial court's interpretation of the bond. *LDS Hospital v. Capitol Life Ins. Co.*, 765 P.2d 857, 858 (Utah 1988).

■ Contract interpretation begins with an examination of the contract itself to determine the intentions of the parties. *Id.* The document should be interpreted in a manner to harmonize all of its provisions and terms, to the extent possible. *Id.*

■ The question of whether a contract provision is ambiguous, i.e., susceptible to two or more reasonable interpretations, is also a question of law. *Village Inn Apartments*, 790 P.2d at 582. Generally, ambiguous provisions will be construed against the drafter of the contract only if extrinsic evidence fails to clarify the intent of the parties. *Wilburn v. Interstate Electric*, 748 P.2d 582, 585 (Utah App.1988). However, where an insurance contract is concerned, ambiguous provisions are usually construed against the insurer without resort to extrinsic evidence, because insurance contracts are ordinarily standard forms, whose language is not negotiated by the parties. *Id.* at n. 2; *LDS Hospital v. Capitol Life*, 765 P.2d at 858.[5]

---

**4.** In its briefs, Aetna raised an eighth alleged error in the trial court's refusal to join F & D as a necessary and indispensable party, but abandoned that point at oral argument.

**5.** In this case, Aetna points out that Standard Form 22 is the product of arms' length negotiation between the Surety Association of America and the United States League of Savings and Loan Associations. *See Sharp v. Federal Savings & Loan Ins. Corp*, 858 F.2d 1042, 1046 (5th Cir.1988). This, however, does not change the fact that, as between Aetna and Home, Home had little say in the drafting of this particular bond. Nor does the language of the bond reflect that the originators of Standard Form 22 contemplated and provided for the particular

Aetna's bond, as well as the various riders incorporated therein, was such a standard form.

■ Provisions excluding coverage are also strictly construed against the insurer. *LDS Hospital v. Capitol Life*, 765 P.2d at 859; *Valley Bank & Trust Co. v. United States Life Title Ins. Co. of Dallas*, 776 P.2d 933, 936 (Utah App.1989). Similarly, ambiguities in insurance applications will be construed against the insurer, to avoid denial of coverage because of alleged misrepresentations. *E.g., Wardle v. International Health & Life Ins. Co.*, 97 Idaho 668, 551 P.2d 623, 626 (1976); *see also*, 2 *Couch On Insurance* 2d § 15:90 (1984). With the foregoing in mind, we proceed to our analysis.

## SECTION ELEVEN

■ Aetna's first contention is that its bond excludes all coverage for losses caused by Glad's dishonest conduct, because Glad's dishonesty was known to Home before the Aetna bond went into effect. The relevant language is contained in section eleven of the identical F & D and Aetna bonds, which in pertinent part provides: "This bond shall be deemed terminated or cancelled as to any Employee—(a) as soon as the Insured shall learn of any dishonest or fraudulent act on the part of such Employee...."

The facts relevant to Aetna's contention are as follows: Home's loss was caused by Glad's dishonest processing of the AFCO investors' loans in November and early December 1981. Home first learned of "any dishonest act" by Glad in mid-December 1981, when it learned of dishonest conduct unrelated to the AFCO investor loans, and promptly fired him. Glad's dishonest investor loan processing and Home's subsequent discovery of Glad's other dishonest conduct occurred while the F & D bond was in effect. On June 21, 1982, the F & D bond was superseded by the Aetna bond.

Aetna and Home agree that once Glad's dishonesty became known to Home in mid-

December 1981, section eleven of the F & D bond terminated coverage for losses caused by any subsequent dishonest conduct by Glad. Once an employer is on notice of an employee's dishonesty, the fidelity insurer cannot be required to indemnify losses resulting from similar *subsequent conduct* by that same employee. It is quite proper to shift the risk of loss due to employee dishonesty from the insurer to the insured once the insured knows of the dishonesty, but elects to retain the employee. 13 *Couch on Insurance* 2d § 46:247 (1982).

■ It is also proper to refuse coverage for losses caused by an employee whose dishonesty is known to the employer even if the conduct through which the dishonesty is revealed is unrelated to subsequent conduct that actually causes a loss. *St. Joe Paper Co. v. Hartford Accident & Indemnity Co.*, 376 F.2d 33, 35 (5th Cir.1967) (*modifying and affirming* 359 F.2d 579 (1966)), *cert. denied*, 389 U.S. 828, 88 S.Ct. 91, 19 L.Ed.2d 86 (1967). Thus neither the F & D bond nor the Aetna bond would have covered Home for any dishonest conduct by Glad, occurring after mid-December 1981.

Aetna argues that because Glad was known to be dishonest before the Aetna bond took effect, its bond was void ab initio as to losses caused by *any* and all of Glad's dishonest conduct, whether such conduct occurred before or after mid-December 1981. Aetna cites several cases in support of its position, which we examine in some detail.

Three cases cited by Aetna involve employee fidelity insurance that was void ab initio as to certain employees of the insureds. *Ritchie Grocer Co. v. Aetna Casualty & Sur. Co.*, 426 F.2d 499 (8th Cir. 1970), and *Verneco, Inc. v. Fidelity & Casualty Co. of New York*, 253 La. 721, 219 So.2d 508 (1969), involved fidelity loss insurance that contained section eleven-type provisions. The insured in each case hired an employee, knowing that the employee

---

problems we face in the present dispute. While specific evidence regarding Home's and Aetna's intentions here might persuade us to do other-

wise, the absence of such evidence leaves us with the basic rule of construing the bond, where unclear, in Home's favor.

had a history of theft. The employees then stole money from the insureds, who were denied recovery for the losses under the insurance policies because they knew of their employees' dishonesty from the outset of the employment. Therefore, the policies had never covered any loss caused by the employees' dishonesty. Similarly, in *St. Joe Paper*, 376 F.2d 33, an insured became aware of its employee's likely dishonest conduct before the relevant fidelity loss insurance was issued. Losses attributable to that same course of dishonesty were therefore not recoverable under the policies.

In *Ritchie Grocer* and *Verneco*, the insureds hired employees who were already known to be dishonest. It was consistent with the policy enunciated by *Couch on Insurance* to deny insurance coverage for losses caused by subsequent dishonest conduct of those employees: the risk of such losses properly fell upon the insureds who, despite awareness of employee dishonesty, opted to hire the employees. However, in the present case, Glad's dishonesty did not become known by Home until after he had already engaged in the dishonest conduct that caused the losses for which recovery was sought under the Aetna bond. *Ritchie Grocer* and *Verneco*, therefore, are not decisive as to whether Home was covered for those losses.

In *St. Joe Paper*, the conduct that put the insured on notice of its employee's dishonesty was part of the same conduct that caused the losses for which insurance coverage was denied. Again, it was proper to deny the insured's effort to shift the risk of loss caused by such conduct from itself to the insurer, where the insurance policy in question was not purchased until after the employee's dishonesty was known by the insured and the employee was retained despite that knowledge. It appears that the insured in *St. Joe Paper* did not have any fidelity insurance at the time its employee's dishonesty became known. It was not possible to obtain coverage for losses caused by the employee's dishonesty where there had been no prior coverage at all.

Here, however, Home was covered under the F & D bond when Glad's dishonesty became known. Under section eleven of the F & D bond, and consistent with *Ritchie Grocer* and *Verneco*, Home's coverage under the F & D bond terminated with respect to any dishonest conduct that Glad might have engaged in after Home learned of his dishonesty, but continued for losses caused by his *prior* dishonest conduct in Home's employ. Aetna argues that its bond, which replaced the F & D bond, did not continue this coverage. Aetna cites *Fidelity & Casualty Co. of New York v. Central Bank of Houston*, 672 S.W.2d 641 (Tex.App.1984), and *C. Douglas Wilson & Co. v. Insurance Co. of North America*, 590 F.2d 1275 (4th Cir.), *cert. denied*, 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979), in support of its position.

*Central Bank* involved a renewal fidelity bond with the same section eleven provision as the bond in question here. The prior bond, issued by the same insurer, was identical. The insured bank learned that one of its employees was dishonest two months before the renewal bond was issued, so that coverage for that employee had terminated under section eleven of the prior bond after the discovery. The bank sought recovery under the renewal bond for various losses arising from the dishonest conduct of the employee.

The *Central Bank* court held that the renewal bond did not "reinstate coverage for an employee that had already been terminated by a known dishonest act; it simply *continue[d] whatever coverage existed at the time of renewal*." 672 S.W.2d at 647 (emphasis added). It was therefore unnecessary for the insurer to raise a void ab initio defense to coverage under the renewal bond. *Id*. Thus the insurer was not liable for losses caused by dishonest conduct of the employee that occurred after his dishonesty became known. However, the insurer *was* liable under the renewal bond for losses arising from the employee's dishonest conduct that had occurred *before* he was found to be dishonest. *Id*. at 650. This coverage had not terminat-

ed under the prior bond and continued under the renewal bond.[6]

Under *Central Bank,* if Home had elected to renew its F & D bond, the renewal bond would have covered the losses in question here, because those losses arose from Glad's dishonest conduct that took place before Home learned that Glad was dishonest. Such coverage would not be a reinstatement of terminated coverage, but simply a continuation of existing coverage. Instead of renewing the F & D bond, however, Home elected to replace it with an identical bond from Aetna. Aetna argues that, as a new insurer, it was not compelled to assume coverage for losses resulting from Glad's pre-mid-December 1981 dishonesty, even if such losses would have been covered by a renewal of the F & D bond. *Wilson* supports Aetna's position.

*Wilson* involved an original employee fidelity bond and a pair of replacement bonds from different insurers, all of which contained coverage termination provisions essentially identical to section eleven of the bonds in this case. In *Wilson,* as here, the insured's employee engaged in certain dishonest conduct while the original bond was in effect, but the insured did not, at that time, learn of the employee's dishonesty. Later, while the original bond was still in effect, the insured learned of other, unrelated dishonest conduct by the same employee, but did not discharge him. Nine days after learning that its employee was dishonest, the original bond expired and the replacement bonds went into effect. One month later, the insured learned of the earlier dishonest conduct of its employee, whereupon the employee was discharged. As in the present case, the loss for which the insured sought recovery was caused by the earlier dishonest conduct, and not by the conduct through which the employee's dishonesty first became known.

**6.** As acknowledged by the parties, *Central Bank* is confusing to read at first. It appears to support Aetna's void ab initio argument in that it states at one point that Central Bank's loss coverage as to its dishonest employee terminated on December 11, 1974, the date the renewal bond was issued. 672 S.W.2d at 650; *see id.* at 647. The jury in *Central Bank* is described as having found that the bank employee's dishonesty became known "before December 11, 1974," *id.* at 644, then is implicitly described as finding more precisely that the dishonesty came to light on October 24, 1974. *Id.* at 646. We find the confusion to be resolved by reference to the court's discussion holding the appellant insurer's void ab initio argument to be unnecessary:

> The jury's answer to special issue sixteen did not absolve appellant of liability for losses occurring after *October, 1974* because the renewal bond which was issued December 11, 1974 was void from its inception. Rather, appellant is absolved of liability for these [post-October 1974] losses because a renewal policy does not reinstate coverage for an employee that had already been terminated by a known dishonest act; it simply continues whatever coverage existed at the time of renewal.... It was unnecessary for appellant to plead a void ab initio defense. It may rely on its bond termination defense...."

*Id.* at 647 (emphasis added). This passage indicates that coverage as to the dishonest employee did not terminate on the bond renewal date, but rather that it had already terminated at that time. The "continuing coverage" under the renewal bond refers to coverage for losses caused by the employee's dishonest behavior that took place before the employee was known to be dishonest.

Aetna argues that the actual distinction in *Central Bank* was not dishonest employee conduct occurring before versus after the employee became known as dishonest, but between coverage under the renewal bond and that under the prior bond issued by the same insurer. However, nothing in the *Central Bank* opinion indicates that the insured's allowed recovery was under the prior bond, or that the insured even based its claim upon the prior bond. Instead, we are satisfied that, consistent with the above-quoted language, the portion of Central Bank's losses that were held recoverable were so held on the basis of the renewal bond's continuation of coverage that had not terminated under the prior bond.

The *Central Bank* opinion also does not clearly distinguish between the occurrence of an employee's dishonest conduct and the occurrence of the losses, if any, caused by a specific episode of such conduct. Rather, the analysis appears to assume that an episode of dishonest conduct gives rise to a roughly contemporaneous loss. While that may have been the case in *Central Bank,* it is not what occurred here. Our focus for section eleven analysis is on when employee dishonesty becomes known to the financial institution, terminating coverage for losses caused by subsequent dishonest conduct. Losses attributable to dishonest conduct that the employee engaged in before being revealed as dishonest, however, remain covered under section eleven, even if the losses themselves do not become known until after the employee is found to be dishonest.

The *Wilson* court held that because the insured knew of its employee's dishonesty before the replacement bonds went into effect, and because the insured did not disclose the dishonesty to the issurers of the replacement bonds, those bonds never went into effect as to any losses caused by that employee's dishonesty. *Wilson*, 590 F.2d at 1279. Therefore, the losses caused by the employee's dishonesty were not covered under the replacement bonds, even though those losses arose from dishonest behavior that had occurred before the insured learned its employee was dishonest. In a footnote, the court indicated that had the insured elected to extend the original bond, that bond would have covered those losses. *Id.* at 1279 n. 6. The court stated that the "unfortunate position in which Wilson finds itself was occasioned in part by sheer bad luck in timing as to the change in insurers...." *Id.* at 1280.

We do not find *Wilson* persuasive. Its analysis is troublesome because of the reliance it places on sheer luck to determine whether certain losses are covered under a replacement fidelity bond, even where a renewal of the prior bond would cover them. As stated by the *Wilson* dissent, the analysis "defeat[s] the purpose of insurance and base[s] recovery on chance." *Id.* at 1291 (Hoffman, District Judge, concurring in part and dissenting in part). We observe that a fundamental purpose of any contract is to define the relationship of the contracting parties and provide the maximum possible stability and predictability to that relationship, thereby minimizing the effect of chance or luck.

Our scrutiny of section eleven of the Aetna bond reveals no language that mandates the result reached in *Wilson*. As interpreted by the foregoing authorities, it clearly bars recovery for any losses Glad might have caused subsequent to mid-December 1981, had Home not fired him. However, by itself, the section simply does not address questions of ongoing coverage between successive insurers.[7] Section eleven is, therefore, ambiguous on that ques-

tion, and susceptible to the interpretation that it does not bar the continuation of the same fidelity loss coverage under the Aetna bond that existed under the F & D bond. Therefore, utilizing rules of construction applicable to insurance contracts, we construe section eleven to provide coverage here. Such a construction promotes predictability of bond coverage and minimizes the impact of luck or chance. Therefore, we hold that coverage for losses caused by Glad's dishonest conduct, where that conduct occurred before Home learned that he was dishonest, and where coverage for such losses would have continued under renewal of the F & D bond, is not barred by section eleven of the Aetna bond.

Our holding is supported by the absence of any extrinsic evidence suggesting that, at the time the Aetna bond was issued, the parties intended that it would provide diminished coverage compared to that provided under the F & D bond. The Aetna sales agent prepared the Aetna bond proposal, which read in part: "I propose a bond be issued effective June 21 to replace the present bond. It will provide *full* retroactive coverage. The bond will be issued through Aetna Casualty & Surety Company." (Emphasis added.) There is no evidence of any discussions between the parties during the bond application process as to any risks covered by the F & D bond that would not continue to be covered under the identically-worded Aetna bond.

Our section eleven holding is also supported by our understanding of the risk-shifting purpose of section eleven. The hiring or retention of an employee who is known to be dishonest is effectively a conscious decision to increase the risk of loss due to employee dishonesty. Section eleven-type provisions properly shift such increased fidelity loss risk to the employer. On the other hand, firing the dishonest employee does not affect the risk that some dishonest act committed before the employee was found to be dishonest will result in a loss. Nor does changing insurers affect

---

7. In contrast, one of the replacement bonds in *Wilson* provided that fidelity coverage canceled as to a particular employee under a prior bond

could not be reinstated under the replacement bond without an additional agreement in writing. 590 F.2d at 1290.

this risk. Absent a clear agreement to the contrary, an insured who purchases replacement employee fidelity coverage that appears to be identical to the prior coverage should be entitled to coverage that is in fact identical with respect to section eleven limitations.

In sum, section eleven does not bar Home's recovery from Aetna. So long as the loss caused by Glad's dishonest behavior was discovered within the effective period of the Aetna bond, that loss is recoverable. We turn to the question of when the loss was discovered.

## DISCOVERY OF LOSS

■■ Aetna argues that Home's loss was discovered before the Aetna bond went into effect and, therefore, does not fall within the coverage period of the bond. The bond provisions relevant to this argument are found in the "Insuring Agreements" and "Conditions and Limitations" portions of the bond.

The preamble to the Insuring Agreements states the bond will cover any "loss sustained by the Insured at any time but discovered during the Bond Period...." The insuring agreements define the losses that are covered under the bond. Among the covered losses are those related to employee fidelity.

Through bond rider number 6041 to the insuring agreements, a fidelity loss is defined as "[l]oss resulting directly from one or more dishonest or fraudulent acts of an Employee, committed anywhere and whether committed alone or in collusion with others...." "Dishonest or fraudulent acts" are further defined as those committed "with the manifest intent: (a) to cause the insured to sustain such loss; and (b) to obtain financial benefit for the Employee...."[8]

Coverage for all types of losses defined in the insuring agreements is expressly subject to the insured's compliance with the "Conditions and Limitations" portion of the bond. Section four of the Conditions and

Limitations requires the insured to give prompt notice of loss to Aetna: "At the earliest practicable moment after discovery of any loss hereunder the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars."

Rider 6091 to the section four notice requirement defines the "discovery of any loss hereunder," triggering the duty to notify the insurer, as the moment when the insured learns of a *possible* loss:

Discovery occurs when the insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred even though the exact amount or details of loss may not be then known. Notice to the insured of an actual or potential claim by a third party which alleges that the Insured is liable under circumstances, which, if true, would create a loss under this bond constitutes such discovery.

The bond is therefore a "discovery bond," which promises to compensate the insured for losses that are discovered within the effective bond period, regardless of when those losses actually occur. One such compensable loss is a fidelity loss, which consists of two, causally joined elements: (1) employee dishonesty; and (2) a loss. As a condition for recovery of a fidelity loss, the insured must promptly notify the insurer upon learning of the possibility that it has sustained, or will sustain, such a loss.

■■ Aetna argues that the definition of "discovery" given in rider 6091, applicable to the insured's duty of prompt notice, also controls the question of when a fidelity loss is discovered and, therefore, whether it is compensable under the bond. In effect, Aetna's argument is that the "loss" element of a fidelity loss is to be construed as "possible loss."

8. The jury found that Glad's conduct in processing the AFCO investor loans met this definition of employee dishonesty, and Aetna does not challenge this finding on appeal.

Aetna points to numerous events that may well have constituted discovery of a fidelity loss for the purpose of the bond's notice requirement. These events include Affleck's February 1982 letter to Home relating the irregularities in the AFCO investor loan processing, closely followed by delinquencies in those loans; the well-publicized AFCO bankruptcy petition of March 1982; and the service of complaints by AFCO investors against Home beginning in April 1982. The AFCO investor complaints are of particular note in that they alleged the mishandling of the investor loans which ultimately resulted in the *Armitage* judgment against Home, and, as such, may have met the "notice ... of an actual or potential claim" definition of discovery applicable to Home's prompt notice duty.

All these events occurred before the Aetna bond was issued in June 1982. Arguably, many of these events alerted Home to the possibility of a loss due to Glad's dishonesty.[9] Therefore, Home's failure to notify Aetna of a possible fidelity loss until December 9, 1982—nearly six months after the Aetna bond was issued, and ten months after problems with the investor loan processing came to light—arguably may have been a breach of the bond's prompt notice requirement.

Aetna, however, does not argue that any breach of the prompt notice requirement by Home should prevent recovery under the bond. The trial court held that recovery could not be denied for breach of the prompt notice requirement because Aetna failed to show that it was prejudiced by any such breach. Aetna does not challenge that holding on appeal. Aetna's argument is limited to its contention that a loss is discovered for the purpose of coverage at the same time it is discovered for the purpose of notifying the insurer, that is, when the possibility of the loss becomes known. If Aetna is correct and the possibility of Home's fidelity loss was discovered before the Aetna bond went into effect, Aetna cannot be required to compensate Home for that loss. Aetna cites a number of cases involving similar discovery bonds in support of its contention.

The bulk of the cases cited by Aetna deal with arguments that the insureds had breached the prompt notice requirements of various bonds similar to the Aetna bond. *See Perkins v. Clinton State Bank,* 593 F.2d 327 (8th Cir.1979); *Federal Deposit Ins. Corp. v. Aetna Casualty & Sur. Corp.,* 426 F.2d 729 (5th Cir.1970); *Alfalfa Elec. Coop., Inc. v. Travelers Indemn. Co.,* 376 F.Supp. 901 (W.D.Okla.1973); *National Newark & Essex Bank v. American Ins. Co.,* 76 N.J. 64, 385 A.2d 1216 (1978). Because Aetna is not arguing on appeal that Home breached its prompt notice duty, these cases are not useful to its appeal. We are also not persuaded by other authority cited by Aetna, some of which, nevertheless, warrant closer attention.

We first examine those cases cited by Aetna, which, because they focus on the question of when the employee dishonesty element was discovered, all proceeded on an assumption that the loss element of the fidelity loss had both actually occurred and been discovered before the employee dishonesty element was discovered.[10] *First Nat'l Bank of Bowie v. Fidelity & Casualty Co. of New York,* 634 F.2d 1000 (5th Cir.1981); *Empire State Bank,* 448 F.2d

9. Aetna also cites the revelation of Glad's loan kickback in December 1981 as information that sparked Home's duty to notify Aetna of a "possible loss." As found by the jury, however, the December 1981 discovery that Glad was dishonest involved activities unrelated to the losses eventually incurred via the AFCO investor loans.

10. This assumption is somewhat troublesome in *First Nat'l Bank of Fleming v. Maryland Casualty Co.,* 41 Colo.App. 195, 581 P.2d 744, 745 (Colo. App.1978), in that it refers to "probable" loss, without analysis or explanation. A similar problem exists in *USLIFE Savings & Loan Ass'n.*

v. National Sur. Corp., 115 Cal.App.3d 336, 171 Cal.Rptr. 393, 398 (1981) (discussed more fully in footnote 11) and its reference to loss "established by the record." *See Pacific–Southern Mortgage Trust Co. v. Insurance Co. of N. Am.,* 166 Cal.App.3d 703, 212 Cal.Rptr. 754, 758 (1985) (criticizing *USLIFE*'s failure to analyze whether loss occurred at same time as fraud). *United States Fidelity & Guar. v. Empire State Bank,* 448 F.2d 360 (8th Cir.1971) at least establishes the fact of loss in its recitation of the insured's exercise of its repossession and liquidation remedy upon its borrower's default.

360; *Fleming*, 581 P.2d 744. With discovery of the loss itself thus given, the question of when the employee dishonesty element was discovered was determinative of when the fidelity loss itself, was discovered.[11]

The insurer's denial of recovery was affirmed on appeal. The court noted that the employee improprieties that were known before the bond was issued were, by themselves, dishonest and fraudulent. The court rejected the insured's contention that it did not know the improprieties amounted to dishonesty until it learned, during the bond period, of the kickback allegation. *USLIFE*, 171 Cal.Rptr. at 398. Accordingly, the employee dishonesty element of the fidelity losses had been discovered before the bond period commenced, and the losses were not covered under the bond. *Id.* The court seems to have also held, in effect, that the alleged kickbacks had never occurred, apparently based on the employees' submission of affidavits denying the kickbacks. *Id.* at 396–97. Therefore, the insured had presented "no new facts" during the bond period to show that its loss was caused by employee dishonesty. *See id.* at 398.

*Bowie* states that discovery of loss "within the meaning of the loss provisions of the Bond [occurs] when the insured party discovers facts sufficient to create a condition in which the insured might be subjected to a claim against which it is indemnified by the Bond." 634 F.2d at 1004. The disputed provision in the *Bowie* bond, however, was not a "loss provision." Rather, it was a provision indemnifying the insured for legal costs incurred in defending itself against claims which, if proven, would create a covered loss. In *Bowie*, the insured successfully defended seven suits that contained such claims, thus *preventing* a covered loss. It sought to recoup these defense expenditures under the legal cost indemnification provision. The court refused to limit coverage under that provision to only those situations in which the insured lost such a suit. *Id.* at 1005.

The *Bowie* court properly equated discovery of loss for the purpose of legal cost indemnification with discovery of *possible* covered loss, rather than actual loss. However, its statement that discovery of loss also means discovery of possible loss for the purpose of loss coverage was neither central to its holding nor supported by the cases cited.[12] Accordingly, we do not find that statement persuasive support of Aetna's position here.

In *Fleming*, the insured bank determined that a loan it had made would, "in all probability," result in a loss, by virtue of the borrower's "delinquent and sporadic"

11. *But see USLIFE Sav.*, 171 Cal.Rptr. 393, which implicitly adopted the fidelity coverage interpretation urged here by Aetna. It did this by reference to the prompt notice requirement of the bond in question there, which appears identical to that in Home's Aetna bond. 171 Cal.Rptr. at 398. Apparently, the bond in *USLIFE* did not define "discovery of loss" for purposes of the notice requirement as does the bond in question here; however, the court applied a case law-derived definition similar to the "reasonable person" standard of the Aetna bond notice requirement. Like Aetna, the insurer in *USLIFE* argued that the fidelity loss for which compensation was sought was not discovered within the bond's effective period. Like *Fleming*, however, the issue in *USLIFE* was not when the losses themselves were discovered, but rather when the dishonest employee conduct that made them fidelity losses was discovered. That conduct consisted of improper student loan processing, including failure to comply with applicable federal regulations, granting the loans to ineligible students, and hiding such acts from the insured, which became known to the insured before the bond in question came into effect. A single additional impropriety—alleged kickbacks to the involved employees—came to light after the bond's effective date. The insured sought recovery for the fidelity losses under the bond.

12. The cases cited dealt with loss in the context of timely notice provisions, *e.g.*, *Federal Deposit Ins. Corp.*, 426 F.2d 729, *Mount Vernon Bank & Trust Co. v. Aetna Casualty & Sur. Co.*, 224 F.Supp. 666 (E.D.Va.1963), and in the context of indemnification for legal expenses, *e.g.*, *Fidelity Sav. & Loan Assoc. v. Republic Ins. Co.*, 513 F.2d 954 (9th Cir.1975), *National Sur. Corp. v. First Nat'l Bank of Midland*, 431 S.W.2d 353 (Tex. 1968). As regards the legal expense coverage, the provision for such coverage in the *Bowie* bond contained its own notice requirement, under which the insured was obligated to promptly notify the insurer of any legal proceedings that if successful, would establish a loss within the loss coverage provisions. 634 F.2d at 1002.

repayments. 581 P.2d at 745. The loan had been made possible by a bank employee who had aided the borrower in fraudulently preparing the loan application. However, this information, constituting the employee dishonesty element of a fidelity loss, was not discovered until over a year after the bond had terminated. Therefore, the fidelity loss was discovered outside the bond's effective period, and no recovery on the bond was allowed. *Id.*

*Fleming* implicitly equates "loss" with "possible loss" for the purpose of fidelity loss coverage only inasmuch as the insured's loss may not have been positively established, but only deemed "probable" within the bond period. *Fleming,* however, does not turn on when the loss was discovered, but on when the employee dishonesty that caused it was discovered. While *Fleming* is sparse on details, it appears that the insured had neither knowledge nor suspicion of the employee dishonesty that caused its loss until well after the bond terminated. Therefore, even if the loss itself was discovered within the bond period, the identity of that loss as a fidelity loss was not discovered until later.

*Empire State Bank* dealt with losses sustained by an insured bank after it had liquidated collateral securing certain loans on which the borrowers had defaulted. As occurred in *Fleming,* an employee of the insured had dishonestly caused the loans to be made. Again, although framed as a question of when the loss was discovered, the *Empire State Bank* dispute actually concerned the discovery of the employee dishonesty element of the fidelity loss. The insured had suspicions as to the dishonesty before the bond in question went

into effect, but the suspicions were not confirmed until the insured uncovered further evidence, after the bond went into effect. The court deferred to the trial court's finding that the discovery of the employee dishonesty causing the insured's loss occurred when the suspicions were confirmed, and not when the suspicions originally arose. *Id.* at 366. This brought the discovery of the fidelity loss within the bond's coverage period.

*Fleming* and *Empire State Bank* demonstrate that a determination as to when the employee dishonesty element of a fidelity loss is discovered is a relatively difficult, subjective one. This is particularly true where, as in *Empire State Bank,* a distinction must be made between a suspicion that this element exists, and confirmation of that suspicion.[13] Where reasonable people could disagree as to when suspicion thus ripens into discovery, it is appropriate to defer to the fact finder's determination as to when discovery of the employee dishonesty element of a fidelity loss occurs. To aid in this determination, it is appropriate to apply standards similar to those found in notice requirements. The fact finder can and should inquire into when a reasonable person in the insured's position would have concluded, i.e., discovered, that dishonest employee conduct had been the cause of a loss.[14]

Here, however, Glad's dishonest processing of the AFCO investor loans was discovered by Home before the actual loss resulting from those loans was established. Possibly, that dishonest conduct was discovered before the Aetna bond went into effect.[15] However, the discovery of Glad's

---

**13.** See also *USLIFE,* 115 Cal.App.3d 336, 171 Cal.Rptr. 393.

**14.** Courts have noted that when an employee has served ably in a position of trust, the discovery of that employee's dishonesty comes hard to the employer. *See, e.g., Perpetual Bldg. & Loan Ass'n v. United States Fidelity & Guar. Co.,* 118 Iowa 729, 92 N.W. 686, 688 (1902) ("The confidence of years is not ordinarily shattered in an instant ..."); *Empire State Bank,* 448 F.2d at 366. This highlights the difficulty of pinpointing the time when the employee dishonesty element of a fidelity loss is discovered, in that the rapidity of such discovery may vary

according to an employee's perceived trustworthiness.

**15.** Aetna's present claim that Glad's dishonesty was discovered before the Aetna bond became effective appears inconsistent with the position it took in its exchange of letters with Home regarding the defense of the *Armitage* lawsuit. Home notified Aetna of a possible fidelity loss arising from the suit in December 1982, during the effective period of the Aetna bond, informing Aetna that pretrial discovery had revealed possible fraudulent conduct by Home employees with respect to the AFCO investor loans.

dishonesty, by itself, and whenever that discovery occurred, did not constitute discovery of a fidelity loss: the remaining necessary element, i.e., a loss, remained to be discovered. Until that loss actually occurred, Home had no claim under the bond. As succinctly put by the trial court, the bond covers loss, not dishonesty.

We further note that in two cases in which the outcome sought by Aetna was obtained, the language of the bonds in question indicated a clear intent to define coverage in terms of when possible loss, rather than actual loss, was discovered. The subject bonds in *Royal Trust Bank v. Nat'l Union Fire Ins. Co.*, 788 F.2d 719 (11th Cir.1986), and *Home Life Ins. Co. v. Clay*, 13 Kan.App.2d 435, 773 P.2d 666 (1989), each contained a section four provision that differs substantially from section four of Home's Aetna bond. Section four of the *Royal Trust* and *Clay* bonds each provided:

> This bond applies to loss discovered by the Insured during the bond period. Discovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known.

*Royal Trust*, 788 F.2d at 720; *Clay*, 773 P.2d at 676. This language clearly ties coverage to discovery of possible loss, because the definition of discovery is given in the context of the bonds' applicability, rather than in the context of notice requirements. In contrast, the bond at issue here, by promising coverage for "sustained" loss, indicates that coverage turns on actual, rather than possible losses.[16] *Royal Trust* and *Clay* are instructive as to how Aetna might have drafted its bond to ob-

tain the result it now seeks. As actually drafted, however, the Aetna bond does not limit coverage in the fashion accomplished by the *Royal Trust* and *Clay* bonds.

We cannot accept Aetna's contention that the loss element of a fidelity loss means possible loss. A possible loss, no matter how likely and no matter how closely tied to employee dishonesty, is no more compensable under the bond than is employee dishonesty standing alone. Indeed, a possible loss may turn out to be no loss at all, for which no coverage is available. Just as the employee dishonesty element must be discovered beyond mere suspicion to create a fidelity loss, so must the loss element be established, and not merely be deemed possible. It makes no sense, without bond language clearly indicating such an intent, to define the bond's coverage by the discovery of events that, in themselves, are not covered.

In fact, the existing bond language indicates a contrary intent. The preamble's promise of indemnification for "loss *sustained* by the insured," indicates that it is an actual loss, not a possible loss, that satisfies the loss element of a fidelity loss. Accordingly, whenever Home discovered Glad's dishonest involvement in the AFCO investor loans, it still had to discover an actual loss in order to complete the discovery of a fidelity loss. If Home made this discovery within the effective period of the Aetna bond, recovery for that loss under the bond is due.

In *Pacific–Southern Mortgage Trust Co. v. Insurance Co. of N. Am.*, 166 Cal. App.3d 703, 212 Cal.Rptr. 754 (1985), the California Court of Appeals noted that in the case of fraudulent loan applications, loss would not necessarily occur at the

---

Responding to Home's notice in September 1983, Aetna declined to assume the defense of the *Armitage* suit. Aetna concluded, contrary to Home's assessment, that the *Armitage* claims were unrelated to employee fraud, and, therefore, if they succeeded, would not create a covered loss under the bond. In effect, Aetna asserted that Home had not discovered any employee dishonesty at a time when the Aetna bond had been in force for over one year. Now, however, Aetna argues that the employee

dishonesty was known before the bond went into force.

16. *Royal Trust* also indicates that the bond in question there contained a rider that provided, "there shall be no liability in respect of any claim ... arising out of any circumstance or occurrence known to the Assured prior to the inception hereof and not disclosed to Underwriters at inception." 788 F.2d at 720. Home's Aetna bond contains no similar language limiting coverage.

same time as the fraud, and might not occur at all:

> [I]n the case of a secured loan made because of fraudulent misrepresentations, the fraud and the loss do not necessarily occur at the same time. The loss may occur much later *or not at all* since the debtor may eventually become creditworthy or the underlying property may appreciate in value so that no actual loss is ever suffered.

212 Cal.Rptr. at 757 (emphasis in original).

The situation described in *Pacific–Southern Mortgage* is much like the situation presented here. The dishonest loan processing by Glad did not immediately cause a loss, but only a possible loss. The possible loss loomed larger with the news that the AFCO investors were resisting repayment of their loans, but this resistance, even when it developed into legal action against Home, still did not amount to an actual loss. The actual loss arose only when the *Armitage* jury verdict and subsequent judgment barred Home from recovering its outlays on the loans. This actual, sustained loss, even if caused by already-known employee dishonesty, was the event that had to be discovered within the effective period of the bond for coverage to apply. Because the *Armitage* jury verdict and judgment were rendered during the effective period of the Aetna bond, Home's loss was both sustained and discovered, completing the discovery of the fidelity loss, during the bond period.[17]

Aetna also relies on the preamble to the insuring agreements, which makes coverage subject to compliance with the bond's Conditions and Limitations, including the notice requirement, to support its argument that "discovery of loss" means "discovery of possible loss," throughout the bond. We are not persuaded. The notice requirement itself, not the definition of discovery found in its rider, forms the condition that must be met. Nor is there evidence that the definition of discovery applicable to the notice requirement is intended to apply to the bond's insuring agreements. Two aspects of the relationship of the notice rider to the bond belie such intent.

First, the rider itself indicates that it is intended "to revise sections 12 and 4" of the bond, the "Rights after Termination" and the notice requirement, respectively. If the definition of "discovery" contained in the rider were intended to apply to that term everywhere it appears in the bond, the rider should not have been labeled as revising only sections twelve and four. Second, section one of the conditions and limitations portion of the bond is specifically entitled "Definitions," and gives certain terms meanings that apply throughout the bond. If the definition of "discovery" found in the notice rider were to apply throughout the bond, the rider, once again, could and should have been made applicable to section one, instead of simply to sections twelve and four. We do not ascribe to the assertion of our dissenting colleague, that the "average purchaser" of a fidelity bond would readily assume that definitional language in a rider *constituting only a procedural provision* would apply to the entire contract, no matter what the context.

Additionally, application of a different definition of "discovery" with regard to the insured's duty of prompt notice, as opposed to defining covered losses in the insuring agreements, does not cause disharmony of the bond language, and is consistent with the different purposes those provisions are intended to serve. The insuring agreements identify the types of losses for which

---

17. The dissent incorrectly argues that under our reasoning, a loss is sustained only when actual damages are precisely determined. The trial court held that a loss was sustained by Home on August 14, 1984, when the jury verdict was rendered, well within the bond period. Such verdict established Home's liability for acts of a dishonest employee, and, therefore, its discovery of a loss sustained. Subsequent determination of the exact amount of the loss did not affect that discovery. Furthermore, Aetna did not argue at trial and has not argued on appeal that the discovery of loss occurred *after* bond coverage. Any such argument would be contrary to one of the "uncontroverted facts" included in the parties' stipulated pretrial order, stating that coverage under the bond was extended through August 20, 1986. The dissent, therefore, argues an issue not properly before us.

compensation will be provided, and reflect no concern with "possible losses."

Notice provisions, however, are properly concerned with both actual and possible loss. "[T]he purpose of a notice of loss provision is to allow the insurer an opportunity to commence investigation and to protect its interests." *National Newark and Essex Bank v. American Ins. Co.*, 76 N.J. 64, 385 A.2d 1216, 1225 (1978). Among the interests to be protected is the interest in preventing a covered loss from occurring. Critical to the furtherance of this interest is prompt notice to the insurer when the possibility of a covered loss becomes known. Therefore, in the context of a notice provision, it is quite appropriate to define discovery of loss as discovery of possible loss.

In light of the foregoing, we hold that Home's fidelity loss was discovered, for the purpose of determining coverage, not when the possibility of loss became known, but when the loss was established by final judgment in the *Armitage* case. Therefore, any discovery, before the Aetna bond went into effect, of the possibility of that loss, does not prevent the loss from being covered under the bond.

## MISREPRESENTATION IN BOND APPLICATION

■ Aetna also argues that coverage for the loss in question should be barred because Home failed to reveal Glad's dishonesty and the growing problems with the AFCO investor loans, including the pending lawsuits, when it applied for the Aetna bond.

Aetna's argument is based upon Utah Code Ann. § 31–19–8(1) (1974), which was in effect at the time Home applied for the bond.[18] That provision reads, in relevant part:

Misrepresentations, omissions, concealment of facts, and incorrect statements [in an insurance application] shall not prevent a recovery under the policy or contract unless:

(a) fraudulent; or

(b) material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(c) the insurer in good faith either would not have issued the policy or contract ..., or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

Aetna correctly notes that subsections (a), (b), and (c) are listed disjunctively, by the word "or," so that the satisfaction of only one subsection can prevent recovery under the policy. *Berger v. Minnesota Mut. Life Ins. Co.*, 723 P.2d 388, 390 (Utah 1986). Here the jury, by special interrogatories, found that in the bond application Home had unintentionally misrepresented or omitted facts that were material to the risk to be assumed, and that had those facts been disclosed, Aetna would have either not issued the bond or excluded coverage for the consequences of Glad's dishonesty. Therefore, while fraud was not proven, the "materiality" and "would not have provided coverage" bases for denying recovery were established under the statute's subsections (b) and (c).[19]

The bond application in question is a standard form furnished by Aetna. Among other inquiries, it asks the applicant to list employees to be covered by the bond, and to list "all losses sustained ... during the last six years." Home responded truthfully to these inquiries. Glad was not listed among the employees to be covered because he was long-departed from Home when the application was completed.

---

**18.** Section 31–19–8 was replaced by Utah Code Ann. § 31A–21–105 in 1986.

**19.** The trial court subsequently ruled that there was insufficient competent evidence to establish the "would not have provided coverage" alternative, and reading subsections (b) and (c) in the conjunctive, rather than the disjunctive, held

that the statutory requirements for denial of coverage had not been met. We do not, however, address the court's ruling, as our analysis focuses on the fact that the omitted material information was not requested in the bond application.

Nothing in the language of the application suggests that former employees are to be listed; additionally, an Aetna underwriter testified that the application does not require such listing.[20] Responding to the query about losses sustained, Home reported there were "none over deductible amount." This was a truthful response since the *Armitage* lawsuit was just getting under way and Home had not yet sustained any actual loss from it. Nor were any other inquiries, by any reasonable reading of the bond application, answered incorrectly by Home.

The omitted material information complained of by Aetna concerned Glad's general dishonesty—for which he had been fired—and the known problems with the AFCO investor loans, including the lawsuits. The bond application, however, makes no inquiry that could be perceived as requiring this information. Aetna's argument, then, is that Home nevertheless had a duty to volunteer this information in the bond application process, and that failure to do so was an omission or misrepresentation that permits denial of coverage under section 31-19-8(1). We find the authorities cited by Aetna for this proposition to be unpersuasive.

Aetna argues that *Sumitomo Bank of California v. Iwasaki*, 70 Cal.2d 81, 73 Cal.Rptr. 564, 447 P.2d 956 (1968), *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 266 F.Supp. 465 (D.Md.1966), and *West Am. Fin. Co. v. Pacific Indem. Co.*, 17 Cal.App.2d 225, 61 P.2d 963 (1936), establish a duty on the part of an insurance applicant to volunteer information not requested in the application. As noted by the trial court, none of those cases clearly addresses such a duty in the context of whether or not the insurer had ever requested the information in question. However, in dictum, *Sumitomo* notes "an absolute duty upon the obligee to volunteer disclosure of all facts materially affecting the risk to the surety on a fidelity bond." 73 Cal.Rptr. at 568, 447 P.2d at 960.[21] To the extent that *Sumitomo* suggests that a surety insurance applicant has a duty to disclose facts about which no inquiry is made, we decline to follow that case.[22]

We believe the rule stated in *Couch* is more appropriate: "It is an insurer's duty to ascertain the facts, and if nothing is concealed, and it makes no inquiries, it cannot complain that the situation was not what it supposed it to be." 9 *Couch on Insurance* 2d § 38:72 (1985). This general

---

**20.** Because the certification lists "employees ... to be covered," and Glad is not listed among these employees, it is arguable that he was never covered under the bond. However, whether a particular employee is listed on a fidelity bond application, while of possible importance, is not dispositive as to coverage; the issue is the parties' intent. *First Hays Banshares, Inc. v. Kansas Bankers Sur. Co.*, 244 Kan. 576, 769 P.2d 1184, 1190 (1989). We find no indication in the application, the bond itself, nor other evidence in the record that loss coverage was to be restricted exclusively to those caused by employees listed on the application. If such intent existed, we would expect the insured to inform Aetna of every personnel change in order to keep fidelity coverage current. Since it is likely that such changes will occur during the bond period and there is no such instruction, it does not appear that the employee list is intended to be exclusive.

**21.** *Sumitomo* did not involve a fidelity bond, but a "creditor bond," guaranteeing repayment of loans. The case involved the question of whether the insured had a *continuing* duty to disclose adverse material information discovered during the course of the insurance contract. 73 Cal.Rptr. at 566, 447 P.2d at 958. It therefore

did not address the question of whether an insurance applicant has an *initial* duty to volunteer unrequested information during the application process.

**22.** *Wootton v. Combined Ins. Co. of America,* 16 Utah 2d 52, 395 P.2d 724 (1964), the only Utah case to which we have been directed on this issue, suggests a result contrary to that urged by Aetna. In *Wootton,* our supreme court held that the failure to volunteer certain information on an insurance application "cannot reasonably be considered as sufficient evidence upon which to base a finding of intent to defraud." 395 P.2d at 726. Because intentional misrepresentation was the issue in *Wootton,* and because the omitted information in that case was not material to the risk for which recovery was sought, that case is not on all fours with the present case. The court did note, however, that the insurer had failed to inquire about the omitted information, despite being aware of a possible risk, and that the insurer could not be permitted to thus "blind itself from ascertaining the truth and then claim wilful misrepresentation ... in order to avoid payment under a policy." *Id.*

rule is properly applicable to fidelity bonds. *See, e.g., United States Fidelity & Guar. Co. v. Howard,* 67 F.2d 382, 383 (5th Cir. 1933); *State v. United Pac. Ins. Co.,* 26 Wash.App. 68, 612 P.2d 809, 811 (1980). The insurer, as the expert in risk allocation, can be relied upon to ask the questions it deems material to deciding whether to approve a policy application. As noted in our recitation of the standard of review applied to insurance applications, problems arising from an insurer's failure to clearly make relevant inquiries rest with the insurer. A contrary rule would, in effect, require an insurance applicant to affirmatively convince an insurer not to issue the applied-for policy.[23]

We also note that it would have been a simple matter for Aetna to include inquiries in the bond application designed to reveal the omitted material information. Simple questions could have been drafted regarding dishonest former employees and the pendency of lawsuits or other circumstances that might cause a covered loss.[24] Contrary to the dissenting opinion, we do not ignore the statutory prohibition of omissions by insureds, but construe it to require that the insured answer all questions posed in the application, omitting no requested responses. The dissent's rationale would require an applicant to speculate endlessly about information the insured might want, with no reasonable means of limiting such speculation.

Because the omitted material information was not asked for in the bond application, and because Home did not intentionally withhold that information from Aetna, we hold that recovery under the bond cannot be denied under former Utah Code Ann. § 31-19-8.

## TRADING EXCLUSION

■ Aetna's fourth argument on appeal is that Home's loss resulted from its trading in securities, and that the loss is therefore excluded from coverage under rider 6030a of the bond.[25] The relevant portion of rider 6030a states:

> The Underwriter shall not be liable under the attached bond for any loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, in the name of the Insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance.

The parties agree that "trading" in rider 6030a means "trading in securities." *Accord, Shearson/American Express, Inc. v. First Continental Bank,* 579 F.Supp. 1305, 1310–12 (W.D.Mo.1984) (because exclusion was adopted from stockbrokers' blanket bond, term "trading" refers to trading in securities). The dispute is whether, as a matter of law, Home's losses on the AFCO investor loans resulted from trading in securities.

The *Armitage* verdict against Home was based on a finding that Home had been a seller of securities for the purpose of proving violations of section 12(2) of the Securities Act of 1933 and of section 61-1-22(1)(a) of the Utah Uniform Securities Act, Utah Code Ann. §§ 61-1-1 to –30 (1989). The securities involved were the promissory notes the AFCO investors received from AFCO in return for their investments.[26] The funds used to make those investments

---

**23.** We note that in its brief, Aetna characterizes Home as "lur[ing] a new bonding company" into insuring the anticipated possible loss. This characterization is not well-taken because the evidence shows that Aetna approached Home with the suggestion that Home replace the expiring F & D bond with an Aetna bond. Any luring, then, appears to have been initiated by Aetna in its attempt to secure Home's business.

**24.** The Aetna underwriter who testified at trial indicated that, subsequent to the 1982 applica-

tion in question, Aetna has added a question about pending lawsuits to its bond application.

**25.** Aetna's trading exclusion argument was presented to the trial court in a motion for summary judgment, which was denied.

**26.** The *Armitage* jury was also instructed that the trust deeds received by Home to secure the AFCO investor loans were *not* securities.

came from the second mortgage loans Home made to the investors. Home's status as a seller of securities arose from the grant of the loans, without which the purchase of the AFCO promissory notes would not have occurred.

The jury in the *Armitage* case also found that Home had engaged in fraudulent conduct in connection with the purchase or sale of a security, and had therefore violated section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated under that act.

The trial court held that Home's conduct in connection with securities sales and its status as a seller of securities for the purpose of the securities acts violations did not compel a conclusion that it had traded securities within the meaning of the rider 6030a trading exclusion. Aetna points out that rider 6030a excludes coverage of losses resulting "directly *or indirectly*" from trading in securities. Because Home was indirectly involved in securities trading by virtue of its loans to the AFCO investors, Aetna argues that the trading exclusion applies. Based on our understanding of the purpose of the trading exclusion, we disagree.

*Shearson/American Express* relates the history of the trading exclusion in bonds issued to financial institutions. The exclusion was adopted from stockbrokers' bonds in the 1970s because financial institutions were becoming increasingly involved in securities trading, which presents higher risks than the usual business of these institutions. Insurers, believing that the extra risks involved in securities trading could not be insured without charging higher premiums, adopted the trading exclusion to eliminate such risks from standard coverage. 579 F.Supp. at 1310 (citing *Digest of Bank Insurance*, 35 (3d ed. 1977)).

Aetna cites two cases as authority for the proposition that the trading exclusion applies where the insured does no more than lend money to a customer who then uses that money to invest in securities. Neither case, however, supports the proposition. *Shearson/American Express* involved an insured whose employee had engaged in securities speculation while falsely representing that he was doing so on behalf of the insured. 579 F.Supp. at 1307–08. *Sutro Bros. & Co. v. Indemnity Ins. Co. of N. Am.*, 264 F.Supp. 273 (S.D.N.Y.1967) involved an insured stockbroker's loss resulting from its acceptance of noncertified checks, which then bounced, in payment for securities it sold. *Id.* at 280. In both cases, the trading exclusion barred recovery by the insureds on their surety bonds.

*Shearson/American Express* and *Sutro Bros.* involved actual ownership interests in traded securities by the insured or an insured's employee. The losses suffered by the insureds were indirect, in that they did not result from the insured's own securities speculation, but from unauthorized speculation by an insured's employee and from the receipt of improper payment for securities, rather than from market losses suffered by the insureds. The history of the trading exclusion, related in *Shearson/American Express*, indicates that it is intended to exclude losses resulting from the insured's, or the insured's employee's, actual investment in securities. It does not indicate that losses resulting from an insured's customers' investments are to be excluded.

Other courts have held that the trading exclusion applies only to an insured's market losses in securities transactions stemming from market fluctuations. *See First Federal Sav. & Loan v. Fidelity & Deposit Co. of Maryland*, 895 F.2d 254, 260–61 (6th Cir.1990); *Insurance Co. of N. Am. v. Gibralco, Inc.*, 847 F.2d 530, 533 (9th Cir. 1988). Here, the securities market losses accrued to Home's loan customers, the AFCO investors. Home's loss arose only when those disappointed investors were able to avoid their obligation to repay the invested funds, as a result of the *Armitage* judgment.

Aetna points to no case holding the trading exclusion to apply where the insured did not acquire at least an arguable ownership interest in securities. Here, Home acquired an interest only in real estate, by the trust deeds on the AFCO investors'

homes. As such, Home was assuming a routine risk of a lending institution, not the high risk of securities speculation to which the trading exclusion is directed.

*Gibralco* also expresses a sound approach to the trading exclusion when employee fidelity coverage is implicated:

> We do not agree with [the insurer] that the trading loss exclusion precludes coverage if a trade occurs anywhere in the chain of events resulting in a loss to the insured. The broad applicability of the trading loss exclusion urged by [the insurer] would eviscerate the employee dishonesty coverage provisions of the Bond in every case where trade might occur in the course of an employee's dishonest scheme.

847 F.2d at 533.

Here, Glad's dishonest conduct was the ultimate cause of Home's loss. Glad's conduct, however, included no representation that either Glad or Home was engaging in securities trading in a manner that the trading exclusion is intended to discourage. The Aetna bond's fidelity loss coverage should not be defeated by an expansive interpretation of the trading exclusion. Therefore, we hold that Home's loss is not excluded from coverage by the trading exclusion.

### JURY INSTRUCTIONS

Aetna's fifth argument on appeal is that the instructions given to the jury improperly failed to allow the jury to consider Home's own mismanagement and poor business judgment as the cause of its loss. At trial, Aetna elicited voluminous testimony about Home's alleged mismanagement and bad judgment in connection with the AFCO investor loans.[27] Aetna argued strenuously that mismanagement and poor judgment, not employee dishonesty, caused the AFCO investor loan fiasco.

■ It is incumbent upon the trial court to instruct the jury on both parties' theories of the case, so long as competent evidence has been presented in support of those theories. *Powers v. Gene's Bldg. Materials, Inc.*, 567 P.2d 174, 176 (Utah 1977); *Pacific Chromalox Div. v. Irey*, 787 P.2d 1319, 1328 (Utah App.1990). Utah R.Civ.P. 51 permits appellate review of jury instructions upon timely, specific objection, or at the appellate court's discretion:

> No party may assign as error the giving or the failure to give an instruction unless he objects thereto. In objecting to the giving of an instruction, a party must state distinctly the matter to which he objects and the grounds for his objection. Notwithstanding the foregoing requirement, the appellate court, in its discretion and in the interests of justice, may review the giving of or failure to give an instruction.

Under Rule 51, we first examine the claimed jury instruction errors to which Aetna objected in the trial court.

■ Aetna objected to instruction number twenty-nine. In substance, instruction twenty-nine told the jury that any negligent failure by Home to prevent Glad's dishonest conduct was not a defense to coverage under the bond.[28] We do not

---

**27.** Much of Aetna's argument on this point is devoted to its argument that Home's recovery under the bond, under an "equitable apportionment" theory, should be reduced according to the portion of its loss caused by mismanagement, as opposed to Glad's dishonesty. Aetna did propose a jury instruction allowing such apportionment, but the trial court refused to give that instruction. Aetna did not object to the refusal to so instruct the jury, nor does it appeal that refusal now. Nor does Aetna's answer to Home's complaint, the stipulated pretrial order in this action, or anything else in the record to which we have been directed, indicate that Aetna otherwise presented its apportionment theory to the trial court. Therefore, on appeal, we do not consider jury instruction errors related to that theory.

**28.** Instruction 29 reads:

> You are instructed that negligence resulting from the existence of inadequate policies and procedures at Home Savings, or the failure to follow policies and procedures then in place at Home Savings, is not a defense available to Aetna if the conclusion drawn therefrom is that better policies and procedures or adherence thereto would have checked the dishonesty, if any, of Larry Glad and prevented a loss that would otherwise have occurred. A surety company is not released from liability by the absence of even ordinary prudence on

perceive Aetna's point on appeal to be related to Home's failure to prevent Glad's dishonesty; rather, it is related to alleged general mismanagement and poor business judgment in approving the AFCO investor loans.[29] The thrust of instruction twenty-nine, however, is limited to Home's failure to prevent Glad's dishonest conduct. So limited, the instruction properly states the general rule that, absent a specific bond provision to the contrary, an insured's negligent failure to prevent employee dishonesty is not a defense to fidelity loss coverage. 13 *Couch on Insurance* 2d § 46:233 (1982); *First Hayes Banshares, Inc. v. Kansas Bankers Sur. Co.*, 244 Kan. 576, 769 P.2d 1184, 1193 (1989). Instruction twenty-nine properly limited Aetna's general mismanagement argument to mismanagement unrelated to Glad's conduct, and, therefore, was proper.

▅ Aetna also objected to the trial court's refusal to give its proffered instructions number two and forty-two. The relevant portions of those instructions read as follows:

[Proposed instruction no. two]: If you find that the losses sustained by Home Savings were solely and proximately caused by Home Savings' own mismanagement, misfeasance or other negligence and/or failure to follow safe and sound lending practices, then you must find there is no coverage for Home Savings under the bond.

[Proposed instruction no. forty-two]: The law does not necessarily recognize only one cause of an injury, consisting of only one factor, one act, or the conduct of only one person. To the contrary, the acts and omissions of two or more persons may work concurrently as the efficient cause of an event or loss, and in such a case, each of the participating acts or omissions is regarded in the law as a cause.

In this case, the bond allows coverage only if Home Savings' loss directly resulted from the dishonest or fraudulent acts, if any, of Larry Glad. A direct result requires a connected sequence between any act of Larry Glad and the loss that ultimately occurred. If you find that a primary contributing cause to the [sic] Home's loss was the failure of the officers and directors of Home Savings to require compliance with appropriate lending practices and procedures, and that such failure was the primary cause of its loss, then the loss was not the direct result of dishonest or fraudulent acts, if any.

Aetna's theory that Home's losses were caused by mismanagement and poor business judgment was presented to the jury in instruction twenty one, which provided in part: "Aetna also claims ... that the independent acts and decisions of Home Savings' management constituted the cause of Home Savings' loss." Instruction twenty-six similarly advised the jury of Aetna's view that Home's loss was caused by factors independent of Glad's dishonesty:

Aetna has asserted as a defense in this action that the loss Home Savings sustained in the *Armitage* litigation resulted not from the dishonesty of Larry Glad, but that it directly resulted from a separate and independent cause.

For Aetna to prevail on this defense, you are instructed that Aetna must prove the existence of an alternative cause of Home Savings' loss, i.e.[,] one separate and independent from Larry Glad's dishonesty, if any.

Taken together, instructions twenty-one and twenty-six adequately apprised the jury of Aetna's theory that Home's loss was caused by mismanagement and bad judgment independent of Glad's conduct, and invited the jury to find in favor of Aetna if it agreed with that theory. Instructions two and forty-two, rejected by the trial court, to the extent they presented the same theory, were unnecessary; and,

---

the part of the insured in lessening the risk. The Aetna bond does not contain any provision to this effect.

**29.** In its brief, Aetna recites much of the testimony it used to show Home's alleged mismanagement and poor business judgment, and characterizes that testimony as dealing with matters unrelated to Glad's dishonesty.

in that they presented the same theory in a longer and more confusing fashion, they were undesirable. Therefore, it was not error, having given instructions twenty-one and twenty-six, to refuse to give instructions two and forty-two.

We now turn to jury instruction arguments presented on appeal that were not made in the trial court. Aetna asks us to exercise our discretion, as permitted under Rule 51, to entertain the merits of these arguments on appeal. An appellant making such a request must convince the appellate court that the merits of its argument should be heard. *King v. Fereday,* 739 P.2d 618, 621 (Utah 1987).

The general jury instructions were condensed into a special verdict form, consisting of five questions, which the jury answered in Home's favor. Aetna argues that the special verdict form was defective, in that one question was phrased in a manner that unfairly favored Home, and another question proposed by Aetna was improperly left out of the special verdict form.[30]

Our review of the record satisfies us that we need not proceed to the merits of Aetna's argument. The trial court took special pains, in light of the complexity of the case, to solicit the parties' specific objections to the jury instructions. This was done on the record, just before the case was submitted to the jury. Unresolved objections from prior, off the record discussions should have been preserved at that time. Aetna had submitted its own proposed special verdict form to the trial court. Additionally, Aetna acknowledges that its counsel performed the final drafting of the special verdict form approved by the court. The trial court's specific request for on the record objections, Aetna's awareness of the alleged verdict form deficiencies arising from earlier off the record discussions, and Aetna's central involvement in drafting the special verdict form gave Aetna ample opportunity to preserve objections to it, on the record, in the trial court. The failure to avail itself of that opportunity relieves us of any obligation to hear those objections on appeal. *See King,* 739 P.2d at 621–22.

## OFFSET OF DAMAGES

Aetna next argues that Home's loss on the AFCO investor loan principal should be offset by $237,760.77, an amount Aetna says Home recouped on the loans.[31] Before trial, the parties had agreed that the jury would decide which of the loans fell within the bond's coverage, and that the trial court would then calculate Home's loss accordingly. However, the factual question of whether the return of certain loan outlays to Home amounted to a recoupment was neither submitted to the jury nor reserved for the court.

Aetna's characterization of the $237,760.77 as a recoupment on the loans, and thus a reduction of the loss sustained by Home, was not made until after the jury's verdict on Aetna's liability was returned. The characterization is based on an exhibit and testimony received by the jury, but the jury was never asked to apply this evidence to determine whether Aetna's characterization was factually correct.[32] Indeed, we

---

30. The parties have not indicated that we should handle arguments regarding special verdict forms any differently than jury instructions under Utah R.Civ.P. 51, so we apply that rule and its related case law to the special verdict argument here.

31. The jury determined that thirty-four of thirty-six AFCO investor loans had been caused by Glad's dishonesty, which brought them within the fidelity loss coverage of the Aetna bond. By the parties' stipulation, the trial court totaled the principal on those thirty-four loans, then subtracted the $5000.00 deductible under the bond, calculating recoverable lost principal to total $889,812.46.

32. Home strenuously objects to Aetna's characterization of the partial return of the loan outlays as an offset of Home's loss, arguing that the $237,760.77 did not diminish that loss, but simply averted other losses. Although we affirm the refused offset on the basis of Aetna's failure to submit the issue to the jury, we note that Home's characterization appears to be correct. It does not appear that any of the loan outlays returned to Home constituted repayment of the investors' debts, which would have reduced Home's loss. Instead, Aetna's exhibit reflects that the bulk of the returned loan funds was applied toward satisfaction of a debt owed directly to Home by AFCO, toward the recission of two investor loans that did not become the

are not directed to anything in the record indicating that Aetna ever made an offset-of-loss argument to the jury.

The trial court noted that while some of the evidence may have supported Aetna's argument, it could not make a fact finding based on that evidence, where Home had not waived its right to have the jury consider it. We agree. "All questions of fact, where the trial is by jury ... are to be decided by the jury, and all evidence is to be addressed to them, except when otherwise provided." Utah Code Ann. § 78–21–2 (1987). Therefore, Aetna is not entitled to an offset of the damages sustained by Home on the AFCO investor loans.

## LEGAL FEES AND COSTS

Aetna finally argues that legal fees incurred by Home in the *Armitage* litigation should not be recoverable under the bond. The fees fall into two categories: (1) Legal fees incurred by the *Armitage* plaintiffs and awarded to them under the *Armitage* judgment, amounting to $190,647.31;[33] (2) Home's own legal costs of defending the *Armitage* litigation, $437,500.00.[34] We consider them in order.

■ Regarding the fees awarded to the *Armitage* plaintiffs, Aetna first argues' they are not covered under the bond because they arose from Home's violation of federal and state securities laws, and thus are excluded under the bond's trading exclusion. Because we have already determined that the trading exclusion does not bar coverage for Home's loss, this argument fails. Next, Aetna argues that the dishonest acts responsible for the *Armitage* judgment against Home were not *malum in se*, but statutory, *malum prohibitum* creatures not included within the bond's fidelity loss coverage. This argument fails because the bond language lacks any such distinction. Finally, Aetna argues that the losses in question were

caused not by Glad's dishonesty, but by Elaine Reese's dishonest backdating of the AFCO investors' loan agreements. Because of evidence that Reese backdated the documents at Glad's direction, this argument is also unpersuasive. Aetna must pay the $190,647.31 legal fees that were awarded to the *Armitage* plaintiffs against Home because these fees were part of the loss sustained by Home as a result of that lawsuit.

■ As to Home's defense costs in *Armitage*, General Agreement C of the bond indemnifies Home for "court costs and reasonable attorneys' fees incurred ... on account of any loss, claim or damage which, if established against the insured, would constitute a valid and collectible loss sustained by the Insured under the terms of this bond." Aetna argues that only one of the seven causes of action in *Armitage* represents a covered loss under the bond, and therefore, its obligation under General Agreement C should be pared down to one-seventh of the stipulated total, i.e., $62,500.00. We disagree.

As noted by the trial court, Aetna's "one-seventh" formula is overly mechanistic and reflects no examination of the actual allocation of attorney time and effort among the seven causes of action. Additionally, Aetna's formula turns on various arguments, already rejected here and by the trial court, that some of the seven causes of action are not covered by the bond. These arguments cannot be resurrected to reduce the fees due under General Agreement C.

Finally, the stipulated total reasonable defense fees, $437,500.00, was decided upon after the trial court rejected Aetna's "one-seventh" formula. In the stipulation, Aetna "specifically reserve[d] the right to appeal the issue of whether Home Savings is entitled to any attorneys' fees, *if it is determined that Aetna owed no obli-*

---

subject of litigation, and to certain refunds to AFCO.

**33.** This amount was arrived at by compromise of the *Armitage* parties' counsel, and is one-half the amount originally sought by the *Armitage* plaintiffs.

**34.** This amount was stipulated to by Home and Aetna as Home's total reasonable legal expenses; Aetna reserved the right to appeal, as it does now, Home's right to recover any portion of this amount.

*gation to provide coverage under the Bond."* (Emphasis added.) Because we have determined that Aetna *is* obligated to provide coverage under the bond, it appears that, under the stipulation, Aetna has waived its right to appeal whether any attorney fees are due.

In sum, the legal fees awarded to the *Armitage* plaintiffs against Home and the stipulated amount expended by Home in its defense of the *Armitage* litigation are both covered under the bond, and are to be reimbursed by Aetna.

### CONCLUSION

For the foregoing reasons, the trial court's judgment in favor of Home Savings is affirmed in all respects.

BILLINGS, J., concurs.

BENCH, Presiding Judge (dissenting):

The majority holds that there is a distinction between the phrase "discovery of loss" as it is used to determine coverage and "discovery of loss" as it used to trigger notice requirements. The majority thereby adopts a minority, if not a totally novel, interpretation of discovery bonds and demands a significant departure from current industry practices. I believe that, under the terms of the bond, Aetna is not liable to Home for any loss resulting from the dishonesty of Glad or the *Armitage* lawsuit. Any coverage for the loss arising from the *Armitage* lawsuit must be found under the F & D bond, not the Aetna bond. Home is simply seeking recovery from the wrong insurer. I therefore respectfully dissent.

The loss was not discovered during Aetna's bond period for any one of three reasons: (1) Rider 6091 expressly provides that discovery includes potential losses; (2) even without the rider, a loss arising from liability created by the dishonesty of an employee may be discovered when the employee's dishonest conduct is discovered, though the liability has not yet been adjudicated; and, (3) under the majority's own rule that a loss may not be discovered until it is sustained, the *Armitage* loss could not have been discovered during the bond peri-od because it was not sustained until *after* the effective period of the bond.

The loss also was not covered because it fell within the exclusion found in Section 11 of the bond. Section 11 excludes from coverage all employees previously known to have committed a dishonest act.

Home also should be barred from seeking recovery for any damages resulting from the *Armitage* lawsuit because it did not, as required by statute, disclose in its application the pending *Armitage* claim, a material fact regarding the hazard assumed by Aetna.

In view of the foregoing arguments, any one of which should be dispositive, I dissent without opinion as to the other issues addressed by the majority with the exception of the offset issue. Even if the loss were covered by the bond, the majority errs in not remanding this case for consideration of the offset of damages issue since the parties had expressly reserved the issue of damages for determination by the trial court rather than the jury. Damages simply may not be determined without addressing any claimed offset.

### I. CONTRACT INTERPRETATION

The majority either misapplies or ignores the following recognized rules of contract interpretation.

"The cardinal rule is to give effect to the intentions of the parties, and, if possible, to glean those intentions from the contract itself." *G.G.A., Inc. v. Leventis,* 773 P.2d 841, 845 (Utah App.1989). *See also LDS Hospital v. Capitol Life Ins. Co.,* 765 P.2d 857, 858 (Utah 1988) (applying the same principle to an insurance contract). "A construction which contradicts the general purpose of the contract ... is presumed to be unintended by the parties." *LDS Hospital,* 765 P.2d at 859 (quoting *Phil Schroeder, Inc. v. Royal Globe Ins. Co.,* 99 Wash.2d 65, 659 P.2d 509, 511 (1983)).

"In interpreting a contract, we determine what the parties intended by examining the entire contract and *all of its parts in relation to each other,* giving an objective and reasonable construction to the contract *as*

*a whole." G.G.A.,* 773 P.2d at 845 (citing *Sears v. Riemersma,* 655 P.2d 1105, 1107–08 (Utah 1982)) (emphasis added). *See also Western Surety Co. v. Murphy,* 754 P.2d 1237, 1240 (Utah App.1988) (applying the same rule to a surety bond). "Where questions arise in the interpretation of an agreement, the first source of inquiry is within the document itself. It should be looked at in its entirety and in accordance with its purpose. All of its parts should be given effect insofar as that is possible." *Big Cottonwood Tanner Ditch Co. v. Salt Lake City,* 740 P.2d 1357, 1359 (Utah App. 1987) (citation omitted).

"[I]t is axiomatic that a contract should be interpreted so as to *harmonize all* of its provisions and *all* of its terms, which terms should be given effect if it is possible to do so." *LDS Hospital,* 765 P.2d at 858 (emphasis added). Courts may not view a subparagraph of a policy in isolation to determine if it is ambiguous; all provisions of a policy must be interpreted together as one contract. *Village Inn Apartments v. State Farm Fire & Casualty Co.,* 790 P.2d 581, 583 (Utah App.1990) (citing 2 G. Couch, *Cyclopedia of Insurance Law* § 15.29 (rev. ed. 1984)); *cf. Draughon v. CUNA Mut. Ins. Soc'y,* 771 P.2d 1105, 1108 n. 3 (Utah App.1989) (reviewing particular provisions in their overall context often aids interpretation).

"Unless there is some ambiguity or uncertainty in the language of the policy, it should be enforced according to its terms. We presume that the language used ... was included for the purpose stated and [we will] give effect to its usual and ordinary meaning." *Bear River Mut. Ins. Co. v. Wright,* 770 P.2d 1019, 1020 (Utah App. 1989) (citations omitted).

> Contract language may be ambiguous if it is unclear, omits terms, or if the terms used to express the intention of the parties may be understood to have two or more plausible meanings. A policy term is not ambiguous, however, merely because one party assigns a different meaning to it in accordance with his or her own interests.

*Village Inn Apartments,* 790 P.2d at 583 (citations omitted).

In determining whether a provision is capable of two or more plausible meanings, such interpretations must be based upon the "usual and natural" meaning of the language used and may not be the result of a "forced or strained construction." *Buehner Block Co. v. UWC Assocs.,* 752 P.2d 892, 896 (Utah 1988) (quoting *Auto Lease Co. v. Central Mut. Ins. Co.,* 7 Utah 2d 336, 325 P.2d 264 (1958)). "Contract terms are not necessarily ambiguous simply because one party seeks to endow them with a different meaning than that relied upon by the drafter." *Buehner Block Co.,* 752 P.2d at 895. *See also Jones v. Hinkle,* 611 P.2d 733, 735 (Utah 1980) ("contract provisions are not rendered ambiguous merely by the fact that the parties urge diverse interpretations.").

An insurance "policy should be interpreted in accordance with the way it would be understood by the average person purchasing insurance." *LDS Hospital,* 765 P.2d at 859. *See also Draughon,* 771 P.2d at 1108. The test for determining the ambiguity of an insurance contract has been stated by the Utah Supreme Court as follows:

> Would the meaning [of the language of the insurance contract] be plain to a person of ordinary intelligence and understanding, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in light of the circumstances, *including the purpose of the policy.*

*Id.* at 858–59 (quoting *Auto Lease Co.,* 325 P.2d at 266) (emphasis added). *See also Wagner v. Farmers Ins. Exch.,* 786 P.2d 763, 765 (Utah App.1990) ("we examine the language from the viewpoint of the average purchaser of insurance").

Parties to an insurance policy "are free to define the exact scope of the policy's coverage and may specify the losses or encumbrances the policy is intended to encompass." *Valley Bank & Trust Co. v. U.S. Life Title Ins. Co.,* 776 P.2d 933, 936 (Utah App.1989) (quoting *Brown v. St. Paul Title Ins. Corp.,* 634 F.2d 1103, 1107 (8th Cir.1980)).

An insurer has the right to contract with an insured as to the risks it will or will not assume, as long as neither statutory law nor public policy is violated. Thus an insurer may include in a policy any number or kind of exceptions and limitations to which an insured will agree unless contrary to statute or public policy.

*Farmers Ins. Exch. v. Call*, 712 P.2d 231, 233 (Utah 1985).

Despite the liberal interpretations often afforded the insured in insurance contracts, "[i]t is not the function of a court to rewrite an unambiguous contract." *Crowther v. Carter*, 767 P.2d 129, 132 (Utah App. 1989) (citing *Provo City Corp. v. Nielson Scott Co.*, 603 P.2d 803, 806 (Utah 1979)). "In construing fidelity bonds, courts follow the liberal rules applicable to insurance contracts. However, the bond cannot be extended by implication or enlarged by construction beyond the actual terms of the agreement entered into by the parties." *FDIC v. Aetna Casualty & Surety Co.*, 426 F.2d 729, 736 (5th Cir.1970).

> These express contract provisions are not rendered ambiguous merely because appellant claims they should be interpreted other than according to their plain meaning.... *[W]e will not inject ambiguity into a contract where none exists in order to save [a party] from what, in retrospect, seems an ill-advised agreement.*

*Crowther*, 767 P.2d at 132 (emphasis added). *See also Valley Bank & Trust Co.*, 776 P.2d at 937.

The unambiguous language of the Aetna bond must therefore be enforced as written, even if the result is that the loss is not covered by the Aetna bond.

## II. DISCOVERY OF LOSS

While this appears to be the first time Utah courts have been called upon to interpret the effect of a discovery provision, such provisions are not novel.[1] The majority nevertheless ignores industry practice and adopts a novel rule of law that a loss may not be discovered until the actual damages resulting from the liability are determined.

The majority's interpretation of the bond is contrary to the general purpose of the bond which is to cover losses "discovered" during the bond's effective period.[2] The majority improperly limits the definition provided in Rider 6091, rather than view it as a part of the contract as a whole. A purchaser of a discovery bond would reasonably interpret the definition of discovery, attached as new language in Section 4, as the definition of discovery as that term is used throughout the bond. Even if Rider 6091 did not exist, the majority's interpretation is a clear departure from the established case law which is in fact consistent with the definition of discovery found in Rider 6091.

If, on the other hand, a loss may not be discovered until it is fully adjudicated, as held by the majority, then the loss claimed by Home in this case still could not have been discovered during the Aetna bond period because the *Armitage* judgment was not entered until after the Aetna bond period had expired. So the *Armitage* loss was discovered either before the Aetna bond period, as I propose, or after the Aetna

---

1. "A discovery provision in a bond limiting liability to losses discovered [during the term] of the bond is valid and enforceable. The contract must be construed the way the parties have plainly written it." *Wachovia Bank & Trust Co. v. Manufacturers Casualty Ins. Co.*, 171 F.Supp. 369, 375 (M.D.N.C.1959).

   A provision of a fidelity bond which clearly limits the liability of the insurer to losses discovered within a certain specified period must be enforced according to its terms, so that there can be no recovery on a fidelity bond if the loss is not discovered within the time specified therein.

13 *Couch on Insurance* 2d, § 46.191 (1982 ed.).

2. The insuring clause, which establishes the general purpose of the bond, provides as follows (with my emphasis):

   The Underwriter, in consideration of an agreed premium, and subject to the Declarations made a part hereof, the General Agreements, Conditions and Limitations and other terms of this Bond, agrees with the insured ... *with respect to loss sustained by the Insured at any time but discovered during the Bond Period,* to indemnify and hold harmless the Insured for [the following losses].

bond period, as the majority's analysis dictates, but it was not discovered during the Aetna bond period.

### A. Rider 6091

The bond clearly states that both coverage and the procedural requirements of Section 4 are triggered by the discovery of a loss. Discovery is defined in the bond by means of Rider 6091, which states in relevant part:

> The attached bond is further amended by inserting the following as the final paragraph of Section 4:
>
> > Discovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred even though the exact amount or details of loss may not be then known. Notice to the insured of an actual or potential claim by a third party which alleges that the insured is liable under circumstances, which, if true, would create a loss under this bond constitutes such discovery.

I believe the foregoing definition of discovery applies throughout the bond and is dispositive of this appeal. The definition clearly permits the discovery of a potential loss that "will be incurred even though the exact amount or details of loss may not then be known." The rider also states that mere notice from a third party of a potential claim of liability, such as the *Armitage* lawsuit, would constitute discovery. There can be no serious dispute, under the definition found in Rider 6091, that Home had discovered its loss prior to the effective period of Aetna's bond.

The majority, however, improperly strains to limit the effect of Rider 6091 to only Section 4. It does so despite the fact that there is absolutely no indication in the

rider that the definition is in any way limited. Not only is the majority's interpretation contrary to the plain language of the rider, it is contrary to the rules of contract interpretation and the language of the bond.

The majority's holding is directly contrary to our general rule regarding riders. "[E]ndorsements, riders, marginal references, and other writings which constitute a part of the contract of insurance are to be read and construed with the policy proper." *St. Paul Fire & Marine Ins. v. Commercial Union Assurance*, 606 P.2d 1206, 1208 (Utah 1980) (quoting 1 *Couch on Insurance* 2d, § 15:30).[3]

In *Royal Trust Bank v. National Union Fire Ins. Co.*, 788 F.2d 719 (11th Cir.1986), the bank tried to limit one part of a bond from applying to language in a rider. The bank claimed that a declaration that the bond covered losses discovered during the bond period should be applied to Section 4, wherein it was located, but should not be applied to a rider that expressly excluded liability for any claim known to the insured prior to the inception of the bond. The court rejected the bank's claim, pointing out that the rider was merely a more explicit restatement of the presumption that any losses discovered prior to the bond period were not covered. Similarly, the definition of discovery added by means of Rider 6091, like the rider in *Royal Trust Bank*, is a consistent, but more explicit, statement of what constitutes discovery as it is used throughout the whole bond.

Rider 6091 amends "[t]he attached bond" to include new and additional language under Section 4. The majority erroneously assumes that the rider is limited to the notice provision found in Section 4 because the instructions on the bottom of the rider indicate that the rider is to "revise sections 12 and 4." The fact that the rider "revis-

---

**3.** Riders to insurance policies constitute an integral part of the contract of insurance. 1 *Couch on Insurance* 2d, § 4:27 p. 386 (1984). This is true even if the rider adds a new and different meaning to the standard contract, as is asserted by the majority. *Id.* at 386–87.

Standard policy laws sometimes expressly authorize the attachment of slips or riders to

contracts of insurance in a form provided thereby, so as to modify the provisions in the body of the policy, and where such a rider is properly attached, pursuant to such provision, it forms a part of the contract and supersedes the original provisions to which it applies. 1 *Couch on Insurance* 2d § 4:29, p. 391 (1984).

es" Section 4 to add a new paragraph, however, in no way indicates that the effect of the new paragraph is limited to Section 4. The reference is merely to the location, not to the effect. There is absolutely no indication in Rider 6091 that the definition is a purely procedural provision, as assumed by the majority. The definition of discovery becomes a new and additional part of the bond's Conditions and Limitations which, by the express terms of the bond, determine the extent of coverage offered.[4] Thus, by the bond's own consistent internal references to applicability, the discovery definition added to Section 4 applies to both the procedural aspects of Section 4, and the substantive aspects of coverage. *See, e.g., Home Life Ins. Co. v. Clay,* 13 Kan.App.2d 435, 773 P.2d 666, 677 (1989) ("The definition of discovery clearly acts as a limitation on coverage").[5]

Given the fact the bond contains only one definition of discovery, and there is no limitation of that definition, a purchaser of the bond would reasonably interpret Rider 6091 as providing the definition of "discovery" to be used throughout the bond. The majority presents no other plausible interpretation of the bond that would render Rider 6091 and its application ambiguous. The definition of discovery found in Rider 6091 should therefore be applied to

questions of coverage as an unambiguous term of the bond.

The language of Section 4 itself supports such a conclusion. First of all, the discovery definition was added as a new and separate paragraph to Section 4 which covers several topics, including notice of loss, proof of loss, and legal proceedings. It is not limited to notice provisions as represented by the majority. Each of the time periods relating to these topics begin when a loss is "discovered." For example, the insured must (1) provide the insurer with notice of the loss as soon as practicable after it is discovered, (2) file a proof of loss within six months of the discovery of loss, and (3) bring suit under the bond within twenty-four months after the loss is discovered. Section 4 also grants an extension of time to begin legal proceedings to recover under the bond if the insured is attempting to recover on account of a judgment against the insured. If an insured seeks recovery on account of a judgment, as does Home, the insured has twenty-four months following the final entry of the judgment before it must begin legal proceedings against Aetna. If, as the majority holds, a loss could not have been discovered prior to the entry of the *Armitage* judgment, then why does the bond expressly provide an

---

4. The bond's insuring clause is explicit with regard to the general applicability of the contract's Conditions and Limitations, of which Section 4 is a key provision. The insuring clause reads in part, with my emphasis: "The Underwriter, in consideration of an agreed premium, and *subject to the Declarations made a part hereof, the General Agreements, Conditions and Limitations and other terms of this Bond,* agrees with the insured...."

The bond reiterates the foregoing incorporation at the top of page four which contains the conditions and limitations of the bond. Page four reads, again with my emphasis: "THE FOREGOING INSURING AGREEMENTS AND GENERAL AGREEMENTS ARE *SUBJECT TO* THE FOLLOWING CONDITIONS AND LIMITATIONS."

Rider 5538 also provides, with my emphasis, that "the attached bond shall be subject to *all* its agreements, limitations and conditions except as herein expressly modified." The majority points to no "express modification" of the discovery definition added to Section 4 that would prevent it from applying to the insuring clause.

5. The majority attempts to distinguish *Royal Trust Bank* and *Home Life Insurance* by claiming that the Section 4 in those cases differed substantially from the Section 4 in the present bond. The language used in those cases, however, is virtually identical to the language used in the present case if one looks at the insuring clause and Section 4 together, as we must when looking at the Aetna bond as a whole. The majority asserts that the language regarding coverage immediately preceding the definition of discovery in the *Royal Bank* bond enlarged the context in which the definition was given, whereas the location of the definition in the present case, i.e., in a section discussing procedural aspects, limited the definition to its immediate context. Section 4 in its entirety, however, by the express terms of the bond, must also be interpreted in the greater context of what constitutes discovery for purposes of coverage. See note 3. The definition therefore applies throughout the bond and is not limited to its immediate context. *See Draughon,* 771 P.2d at 1108 n. 3 (review provisions in overall context).

extension for claims arising on account of such a judgment?

In order to hold Aetna liable, the majority ignores our obligation to enforce unambiguous terms and reads ambiguity into the contract by adopting an unprecedented rule of contract interpretation. For the first time in this state, a court has held that if a definition is not contained in a specific section outlining general definitions, the definition will only affect the section of the contract where it is located. The majority offers absolutely no support for this new and obviously flawed rule. Such a rule will create disharmony in contracts by requiring more than one definition of key terms that are used in more than one section of a contract, but which are not defined in a general definition section. It would create confusion in interpreting contracts if the contractual definition agreed to by the parties would be effective only within a single section while a different common-law definition would be effective throughout the remainder of the contract.[6]

The correct rule is that a definition given to a term in one section of a contract, even though it is not in the general definition section, applies throughout the contract so that the term will be interpreted consistently throughout. *See, e.g., Wagner v. Farmers Ins. Exch.*, 786 P.2d at 765 (applying definitions found in various sections of the insurance contract to other sections of the contract). *Cf. Draughon*, 771 P.2d at 1108

n. 3 (reviewing particular provision in overall context often aids interpretation); *Western Surety Co.*, 754 P.2d at 1240 ("the primary rule ... is to determine what the parties intended by looking at the entire contract and all of its parts in relation to each other...." quoting *Sears*, 655 P.2d at 1107–08).

The usual and natural meaning of the term "discover," as it applies to the present case, is "to obtain for the first time sight or knowledge." *Webster's Third New International Dictionary (Unabridged)* 647 (1986). The majority, however, concludes that the loss may be discovered twice, thereby contradicting the plain meaning of the word "discover." Contrary to the majority's blanket assertion that it is harmonizing the terms of the bond, it is clear that the majority has created considerable disharmony and confusion where none had previously existed.

The majority errs in not applying to the question of coverage the definition of discovery provided in Rider 6091. The clear intention of the parties as set forth in the insuring clause, the rider, and throughout the remainder of the bond is that the definition apply throughout the entire bond. By limiting the effect of Rider 6091 to Section 4, the majority has, in effect, rewritten the bond in order to create coverage under Aetna's bond when, by the express agreement of the parties, none exists.[7]

---

**6.** In the present case, "discovery of loss" means discovery of a *possible loss* in Section 4, but by virtue of the majority's holding, it means discovery of the *actual damages* throughout the rest of the bond. The problem in this approach is readily recognized when one considers that even as the majority pronounces the rule, it violates it. Despite its express rejection of the possibility of discovering a *potential loss* under the case law, the majority interprets "discovery of loss" to mean the discovery of a *potential loss* when considering indemnification for attorney fees. But in the present case, the provision regarding attorney fees is located in Section C of the General Agreements, not Section 4 of the Conditions and Limitations where the "potential loss" definition of discovery is located.

**7.** The majority also fails to acknowledge that Home has the burden of proving that the *Armitage* loss was discovered within the effective period of Aetna's bond rather than the F & D

bond. It is only after Home has met its burden that the burden shifts to Aetna if it wishes to raise any exclusions as a defense. When an insured claims a right to recover under a policy. The insured must

> bring himself within the field therein defined.... He then has brought himself within the policy, and the terms thereof have been met.... When he brings himself within the insuring clause he has made his case ... and any exceptions or conditions which would then deny him relief, take him out of the indemnity provisions, render them inoperative as to him, are matters of defense, and the burden thereof rests on the insurer.

*LDS Hospital*, 765 P.2d at 859 (quoting *Browning v. Equitable Life Assurance Soc'y*, 94 Utah 570, 573–75, 80 P.2d 348, 350–51 (1938)).

The language at issue is found in the insuring clause itself which defines the field within which Home must establish its case. The majority nevertheless treats the definition of dis-

## B. Majority's Departure From Established Case Law

Even in the absence of Rider 6091, the majority's interpretation of Aetna's bond is contrary to the well-established case law holding that a loss is discovered on "the date the fraud was discovered by the bank—not the date the bank was called upon to make the loss good." *FDIC v. Aetna Casualty & Surety Co.*, 426 F.2d 729, 739 (5th Cir.1970) (quoting *Mount Vernon Bank & Trust Co. v. Aetna Casualty & Surety Co.*, 224 F.Supp. 666, 670 (E.D.Vir.1963)). In general, a loss is deemed discovered when "the insured acquires knowledge of any fraudulent or dishonest act resulting in loss." *USLIFE Sav. & Loan Ass'n v. National Surety Corp.*, 115 Cal.App.3d 336, 171 Cal.Rptr. 393, 399 (1981). *See generally, American Surety Co. v. Pauly*, 170 U.S. 133, 18 S.Ct. 552, 557, 42 L.Ed. 977 (1898); *American Surety Co. v. Pauly*, 170 U.S. 160, 18 S.Ct. 563, 564, 42 L.Ed. 987 (1898); *Perkins v. Clinton State Bank*, 593 F.2d 327, 333–34 (8th Cir.1979); *United States Fidelity & Guar. Co. v. Empire State Bank*, 448 F.2d 360, 366 (8th Cir.1971); *Hidden Splendor Mining Co. v. General Ins. Co. of America*, 370 F.2d 515, 517 (10th Cir.1966); *Alfalfa Elec. Co-op. v. Travelers Indem. Co.*, 376 F.Supp. 901, 906 (W.D.Okl.1973); *National Newark and Essex Bank v. American Ins. Co.*, 76 N.J. 64, 385 A.2d 1216, 1224 (1978); *Jefferson State Bank & Trust Co. v. Central Surety & Ins. Corp.*, 408 S.W.2d 825, 831 (Mo.1966).

The majority strains to distinguish the foregoing cases without presenting any cases in support of its position. No other case has taken the approach that a loss may be discovered more than once. The majority must strain to distinguish the case

law because it misunderstands the term "loss." [8]

There are two types of loss covered by fidelity bonds: (1) when an insured immediately parts with its property as a direct result of employee dishonesty as in cases of theft or embezzlement; and (2) when an insured incurs liability due to the dishonesty of an employee which eventually causes an insured to pay damages, such as the liability incurred by Home in this case. *See Jefferson Bank & Trust Co. v. Central Surety & Ins. Corp.*, 408 S.W.2d 825, 830–31 (Mo.1966). The Aetna bond indemnifies Home against both types of losses. *See id.* (notice provisions regarding potential losses and provisions for handling of defense indicate that a bond covers liability).

The trial court and the majority treat this case as if the loss were an immediate parting with property. In such cases, it is obvious that the parting must occur in order to be discovered. This case, however, does not involve an immediate parting with property—it involves a loss arising out of Home's liability to the borrowers created by Glad's dishonesty. The *Armitage* court voided the trust deeds and promissory notes and forgave the debts because Home violated the securities laws and the truth-in-lending laws. In other words, Home was liable to the borrowers for their losses because of the manner in which Home granted the loans.[9]

The majority seems puzzled that the cases merely "assume" that the loss has been sustained, even if damages were not yet established. The cases seem merely to assume that the loss has been sustained because a loss that arises from liability created by a dishonest employee is, in fact, sustained when the misconduct occurs, not

covery as if it were an exclusion. In fact, the definition of discovery is party-neutral. The burden therefore lies upon Home to show that the loss was discovered during Aetna's bond period. There is no presumption against Aetna on that issue.

**8.** The majority and the trial court repeatedly indicate that the Aetna bond was intended to cover any "loss sustained" or "sustained loss" and yet those terms never appear in Aetna's bond. As is apparent from the insuring clause,

the majority and the trial court have selectively combined "loss" with the first word of the phrase following it, i.e., "sustained" and taken the words out of context to create the term "loss sustained."

**9.** The bond itself indicates that it is the misconduct, not the resulting legal damages, that constitutes the loss. Rider 6041 provides that Aetna is only liable for "direct compensatory *damages arising from a loss* covered under this bond." (Emphasis added.)

when the actual damages are determined. *See, e.g., FDIC v. Aetna*, 426 F.2d at 735 (FDIC disposed of nonconforming notes after the termination of bond period and suffered a net loss of $408,362.97). The loss is sustained when the dishonest act is committed, not when a court makes the factual and legal determination that the act was committed and the insured is therefore liable for damages. The misconduct that creates a covered loss is complete when it is performed, not when the damages from such misconduct are adjudicated. Liability is therefore "sustained" at the time of the misconduct, not at the time of final judgment. The loss/liability may therefore be "discovered" at any time following the occurrence of the misconduct.

The receipt of a claim against the insured, or the discovery of misconduct that may subject the insured to a claim, constitutes discovery of a loss.

> Whether the Bank actually discovers dishonesty or actually incurs a loss is, however, completely irrelevant. A loss is "discovered" within the meaning of the loss provisions of the Bond when the insured party discovers facts sufficient to create a condition in which the insured might be subjected to a claim against which it is indemnified by the Bond.

*First Nat'l Bank of Bowie v. Fidelity & Casualty Co. of New York*, 634 F.2d 1000, 1005 (5th Cir.1981).

The cases clearly establish that it is the receipt of a claim against the insured based upon employee dishonesty, not the adjudication of that claim, that constitutes discovery of the loss. *See Jefferson Bank*, 408 S.W.2d at 831 ("the time of discovery of loss mentioned in the bond is not intended to be the time when a claim of the depositor or customer is established ultimately by entry of judgment."); *see also Perkins v. Clinton State Bank*, 593 F.2d 327, 336 (8th Cir.1979) (bank discovered loss when served with complaint).

Once employee misconduct is discovered, or a claim is presented against the insured based on the misconduct, the loss has been discovered. "[T]he time of discovery of the risk insured against is when the bank must reasonably have known and recognized that [the claimant] had suffered a loss and that [the claimant] apparently intended to attempt to hold the bank liable for such loss." *Jefferson Bank*, 408 S.W.2d at 832. *See also FDIC v. Aetna*, 426 F.2d at 739 (the well established rule is that discovery occurs when the insured has "acquired knowledge of some specific fraudulent or dishonest act which might involve the [Insurer] in liability for the misconduct").

The majority correctly reasons that the loss element cannot be satisfied by means of a "possible loss" and that a possible loss is not compensable. What the majority fails to realize, however, is that the two preconditions to coverage as established in the insuring clause by the phrases "sustained at any time" and "discovered during the bond period," each relate to a separate and distinct condition of recovery. "Sustained at any time" is the requirement that there must in fact be an actual out-of-pocket loss before any compensation will be paid. "Discovered during the bond period," on the other hand, determines *who* out of the possible insurers will pay compensation if an actual loss in fact occurs. The two inquiries are totally separate and distinct.

The majority erroneously concludes that the issue of who will indemnify an insured cannot be determined before the issue of whether the insured is entitled to indemnification is decided. This is simply inconsistent with the insurance industry practice that the policy in effect at the time the event occurs provides coverage, even though the extent of that coverage is still unsettled. For example, if a car driver causes an accident and then changes to a new insurance company, there would be no question that the insurance policy in effect when the accident occurred would be the one to provide coverage, even though liability had not been adjudicated when the new policy was purchased.

A fidelity insurer whose policy is in place when a lawsuit is filed has the right to step in and assume the defense against the suit because it is that insurer who must indemnify the insured for any actual damages

resulting from the suit. *See generally First Nat'l Bank of Bowie*, 634 F.2d 1000. If no actual damages result from the lawsuit then the insured and the insurer breathe a collective sigh of relief. *See, e.g., id.* The possibility that no damages may actually result from a lawsuit simply does not prevent an earlier determination of which of the possible insurers will indemnify an insured for those damages if and when they are awarded.

Coverage is triggered by receipt of a claim against the insured or by discovery of dishonest conduct because such events are not prone to manipulation. If a loss will not be covered until its liability and damages are adjudicated by a court, it does not take a great deal of imagination to see how parties will seek to time that litigation to their own benefit. Even without any such manipulation, there is a great risk that coverage may lapse after the misconduct has been discovered; but before the case has been fully adjudicated. The insurance company could then simply refuse to renew the bond and avoid ever paying for the loss. No other insurance company would then step forward and agree to insure against that pending loss absent a large premium to compensate for the dramatically increased risk. In such a situation, the insured would, in all probability, become uninsured under the majority's approach.

In this case, Home incurred liability, and thereby "sustained" a loss, when it granted the loans without complying with the truth-in-lending laws and the securities laws.[10]

Once the loans were closed, no further action occurred to alter that liability. In fact, there was nothing that Home could have done to escape liability. The "loss" was therefore sustained before Home purchased the Aetna bond. It was only the judicial determination of liability and extent of the loss, i.e., the actual damages, that remained unknown and required adjudication to settle. Inasmuch as Home knew of the *Armitage* claim, as well as Glad's alleged dishonest involvement, Home must be deemed to have discovered the loss before it purchased the Aetna bond. Since the loss was discovered during the F & D bond period, and not the Aetna bond period, Aetna is not liable to Home for the *Armitage* loss.

## C. Coverage Under Majority's Approach

If a loss could not be discovered until it is "sustained" by becoming an actual loss, as held by the majority, there still could be no recovery in this case because the actual damages were ascertained *after* the effective period of Aetna's bond. The bond extension itself makes it clear that the *Armitage* loss was not covered.

Pursuant to the option granted to Home in Section 12 of the bond, the parties extended coverage from August 20, 1985 until August 20, 1986. This extension, however, was limited in its scope and only covered the discovery of losses "sustained" *prior to August 20, 1985.* It did not extend coverage for losses sustained during the extension period.[11]

---

**10.** The majority's characterization of this case as a fraudulent/bad loan case is simply erroneous. The loss that Home is seeking to recover is not the result of Glad's dishonesty in falsifying the loan applications and causing Home to lend more to the borrowers than they were able to repay. The loss is the result of Glad's violations of the truth-in-lending laws and the securities laws which created liability for Home. The majority's reliance on *Pacific–Southern Mortgage Trust Co. v. Insurance Co. of North America*, 166 Cal.App.3d 703, 212 Cal.Rptr. 754 (1985), is therefore misplaced.

Even if this claim were the result of the issuance of bad loans, the losses were "sustained" before the Aetna bond was purchased. The *Pacific–Southern* court held that "the loss occurred when the loan defaulted." *Id.* 212 Cal.

Rptr. at 759. The loans in this case had all defaulted and were in the process of being foreclosed before the Aetna bond was ever purchased. Inasmuch as Home knew that Glad's dishonesty was part of the reason why the loans defaulted, one must again conclude that the losses were discovered during the F & D bond period.

**11.** The rider by which the parties extended coverage provides:

It is agreed that:

1. In accordance with and subject to the provisions of the Section of the attached bond entitled "Rights After Termination or Cancellation," the Underwriter hereby grants to the Insured a period of twelve months from 12:01 a.m. of the 20th day of August, 1985, to 12:01

Since the majority holds that a loss cannot be "sustained" until the final adjudication, Home "sustained" its loss at the earliest when judgment was entered in the *Armitage* case rescinding the loans. Home's counsel made the following statement at oral argument before this court:

In August 1984 the jury returned a verdict adverse to Home Savings. In March 1986 that verdict was reduced to a judgment that resulted in the avoidance of the notes and trust deeds, establishing a loss to Home Savings. Now, all parties in this litigation agree, in the briefs, in writing, that *that is the point at which Home Saving's loss was established.* At that point it could not recover from the borrowers, it could not collect from the trust deeds, and that established the loss.

(Emphasis added.)

Under the majority's approach, the loss was sustained after the termination of the original bond period. The loss, therefore, was not covered under the limited extension.

### III. EFFECT OF GLAD'S DISHONESTY UNDER SECTION 11

Even if the loss was discovered within the bond period, it fell under the exclusion provided in Section 11 of the bond which provides: "This bond shall be deemed terminated or cancelled as to any Employee— (a) as soon as the insured shall learn of any dishonest or fraudulent act on the part of such Employee...." As is evident by the foregoing language, the clear purpose of the bond is to insure only those employees not known to be dishonest. At issue is whether the Aetna bond ever covered Larry Glad.

The first question, which the majority totally ignores, is whether this language is even ambiguous.[12] A purchaser of a fidelity bond would reasonably interpret the foregoing provision to mean that the bond will not cover any employee known to be dishonest at the time the bond takes effect. Home's bond application supports this interpretation. Glad was not even listed as an employee intended to be covered. If a reasonable purchaser of the bond were to read Section 11 as a bar to coverage for any employee already known to be dishonest, the purchaser logically would not include his name among the employees to be covered. The majority proposes no other plausible meaning to render Section 11 ambiguous. The parties agreed that the bond would not cover employees known to be dishonest. That agreement should be enforced as written. I would therefore hold that Section 11 unambiguously provides that the bond does not cover any misconduct by Glad because Home had already learned of Glad's dishonesty before it purchased the bond.[13]

The case law on provisions such as Section 11 indicates that the bond is void ab initio as to Glad. *Ritchie Grocer Co. v. Aetna Casualty & Sur. Co.*, 426 F.2d 499 (8th Cir.1970), stands for the proposition that a bond is void ab initio as to any employee known to be dishonest before being hired. In *Verneco, Inc. v. Fidelity & Casualty Co. of New York*, 253 La. 721, 219 So.2d 508 (1969) the employee was known to be dishonest when hired and was already working for the insured when the bond was purchased. In holding that the employee was never covered by the bond,

a.m. of the 20th day of August, 1986, within which to discover loss sustained by the Insured *prior to the date and hour first mentioned.*
(Emphasis added.)

**12.** Those courts which have considered provisions like Section 11 have all considered the provisions to be unambiguous in their declarations that employees known to be dishonest at the inception of the bond are not covered. *See, e.g., St. Joe Paper Co. v. Hartford Accident & Indemnity Co.*, 376 F.2d 33, 35 (5th Cir.) *cert. denied* 389 U.S. 828, 88 S.Ct. 91, 19 L.Ed.2d 86

(1967); *Ritchie Grocer Co. v. Aetna Casualty & Surety Co.*, 426 F.2d 499, 502–03 (8th Cir.1970); *Verneco, Inc. v. Fidelity & Casualty Co. of New York*, 253 La. 721, 219 So.2d 508, 510 (1969).

**13.** Home discovered on or about December 20, 1981, that Larry Glad had received a $15,000 kickback from Robert Mitchell. The $15,000 payment was part of a $31,000 fee received by Robert Mitchell from AFCO for arranging a $100,000 loan to AFCO. Larry Glad's employment was terminated effective December 29, 1981.

the *Verneco* court gave the following reasoning that is especially appropriate for the present case:

> We think it is implicit in these situations that the parties approach the installation of the policy assuming that all employees are honest until they are known to be otherwise. Thus, if the insured then has knowledge of a dishonest person in his employ, he is aware, by the terms of the exclusion clause, that he is not insured for the dishonest acts of that employee. A contrary view of the exclusion clause such as the plaintiff urges us to adopt would permit the insured to obtain insurance against the dishonest acts of employees he knows were dishonest ... although the exclusion clause plainly indicates there can be no coverage after the insured "shall have knowledge" of dishonesty of his employees.

*Id.* at 510–11.

Not only can an individual be excluded by Section 11, but whole transactions might not be covered. When an insured knows prior to the purchase of a bond that a transaction previously entered into by the insured is tainted with dishonesty, the entire transaction is not covered. *See St. Joe Paper Co. v. Hartford Accident & Indem. Co.,* 359 F.2d 579 (5th Cir.1966) *cert. denied* 389 U.S. 828, 88 S.Ct. 91, 19 L.Ed.2d 86 (1967).

The proper inquiry to be derived from these cases is whether an employee is known to be dishonest at the time the bond is supposed to cover the employee. If any dishonesty is known, the bond never covers the employee. Because Glad was known to be dishonest at the time Home desired Aetna's bond to apply to Glad, Aetna's bond did not cover Glad.

The majority nevertheless seeks to invalidate Section 11 as a matter of public policy.[14] It strains to distinguish this case

from *C. Douglas Wilson & Co. v. Insurance Co. of North America,* 590 F.2d 1275 (4th Cir.) *cert. denied* 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979), which is directly on point. In *Wilson,* the insured learned during a routine audit that a vice president had been falsifying the dates and the amounts of advances on standard HUD forms, a clear act of dishonesty. The vice president indicated to the insured that the practice was common in the industry. The practice was immediately stopped. Sometime later, the insured changed insurance carriers and purchased fidelity bonds from Insurance Company of North America (INA) and Hartford.[15] After the INA and Hartford bonds became effective, the insured discovered that the same vice president had not secured letters of credit which the insured was required to secure. The vice president had nevertheless falsely certified that he had secured the letters of credit. The court held that since the insured had known of the vice president's dishonesty in falsifying the HUD forms "before the inception" of the INA and Hartford policies, and since the insured did not notify INA and Hartford of the vice president's previous dishonesty, INA and Hartford could not be held liable for the losses caused by the vice president's failure to secure the letters of credit.

The *Wilson* court directly addressed the argument accepted by the majority in this case and rejected it. "[T]he dissent would have INA and Hartford assume liability for losses resulting from acts committed before the inception of their respective policies by an employee who was *never* within the coverage of the policies. This is an untenable result." *Id.* at 1279 n. 6 (emphasis in original).

In refusing to follow *Wilson,* the majority selectively quotes parts of the *Wilson* court's regrets as if that court felt it had

**14.** The majority is apparently attempting to prevent the risk of coverage lapsing if an insured changes insurance carriers after an employee's dishonesty is discovered and the insured knows it may be liable, but before there is a final judgment establishing any actual loss due to that dishonesty. That risk only arises, however, because the majority refuses to recognize that

discovery of the dishonesty, or notice of a claim, triggers coverage. In other words, the majority is seeking to abate a risk that it has artificially created.

**15.** The INA bond contained the same language as contained in the Aetna bond at issue.

rendered a poor decision. The full text reveals otherwise.

> The unfortunate position in which Wilson finds itself was occasioned in part by sheer bad luck in timing as to the change in insurers and in part by the poor judgment of its own officers. However, mindful of Justice Holmes' admonition, we cannot use this hard case as a vehicle to make bad law.

*Id.* at 1280.

The *Wilson* court did not rely upon "sheer luck" as asserted by the majority. It simply recognized that the timing of the change in insurers, *along with poor business judgment,* rendered the insured uninsured. Had the insured simply revealed its knowledge of the vice president's dishonesty to INA and Hartford when applying for the new bonds, it could have still been covered.

In the present case, the majority's apparent need to stretch in order to find coverage for Home simply is not justified given the fact that Home was insured under the F & D bond at the time of Glad's dishonesty. For reasons unknown to us, Home never pursued indemnification under the F & D bond. Aetna attempted to bring F & D into the suit, but Home blocked that effort. There has been no showing that Home will not be able to recover under the F & D bond, but even if Home is unable

now to recover on its F & D bond, that is Home's fault, not Aetna's. In its efforts to find coverage in the present hard case, the majority makes bad law.

The majority relies on *Fidelity & Casualty Co. of New York v. Central Bank of Houston,* 672 S.W.2d 641 (Tex.App.1984), in creating a novel and truly erroneous legal theory that a successor insurer assumes all liability incurred by a predecessor insurer simply because they both use the same standard form. The majority's analysis contains several serious flaws. When Aetna indicated that it would provide Home with the same coverage previously provided by F & D, it was referring to the *type* of coverage.[16] It was not in any way assuming the liability incurred by F & D during the previous period. "Where a bond contains no language to the effect that it is a continuation of a prior bond, it is an independent contract and will not be deemed to provide continuing coverage from a prior bonding period." *USLIFE Sav. & Loan Assoc.,* 171 Cal.Rptr. at 400.

In order for Aetna to be liable for Glad's dishonest acts, Aetna would have had to expressly agree to continue F & D's coverage of Glad as it existed during the F & D bond period.[17] There simply was no such assumption of coverage by the Aetna bond. In fact, Aetna's bond clearly states in Rider 6059 that "coverage under this policy or

---

**16.** The majority also errs in even considering the bond proposal language since it was not found within the four corners of the contract.

> [W]hen the parties have reduced to writing what appears to be a complete and certain agreement, it will be conclusively presumed, in the absence of fraud, that the writing contains the whole of the agreement between the parties. Also, that parol evidence of contemporaneous conversations, representations or statements will not be received for the purpose of varying or adding to the terms of the written agreement.

*State Bank of Lehi v. Woolsey,* 565 P.2d 413, 418 (Utah 1977). The majority has improperly used the bond proposal language to add a new term to the written agreement.

**17.** This court recently held in *Perkins v. Great-West Life Assurance Co.,* 814 P.2d 1125 (Utah App.1991), that a new insurer does not automatically cover all employees that may have been insured under a predecessor policy. In that case, Mrs. Perkins was an employee of South-

west Health Management, Inc. when she became disabled and was no longer able to work full time. Southwest kept her on its records as a full-time employee, awarding her sick leave, vacation time, and so forth. After she became disabled, Southwest negotiated a new group insurance policy with Great-West Life Assurance Co. Great-West's policy expressly limited coverage to full-time employees and defined full-time employment. When Mrs. Perkins passed away, her husband sought to recover on Great-West's life insurance policy. Great-West then discovered that Mrs. Perkins was not a full-time employee at the inception of the policy and had never returned to full-time employment. Her premiums were returned and her husband's claim against the policy was denied. This court upheld the denial of coverage, reasoning that "[s]ince Mrs. Perkins was not an active employee *on the effective date* of the Great-West policy, or any time thereafter, she was not insured under that policy." *Id.* at 1129 (emphasis added).

bond shall not become effective until such other coverage [as provided by the F & D bond] has terminated." Contrary to the majority's assertion that there is no evidence as to the issue of continuation, Rider 6059 shows that the parties expressly agreed that the Aetna bond was not a continuation of the coverage provided under the F & D bond. The majority's holding is therefore directly contrary to the express agreement of the parties.

The insurance policy in the present case clearly states that it only provides fidelity coverage for employees not known to have previously been dishonest and it expressly provides that there is no continuation of coverage provided by the F & D bond. Since Home knew on the effective date of the Aetna bond that Glad had performed a dishonest act, Glad was never insured under the Aetna bond.

## IV. DUTY TO DISCLOSE

Aetna claims that the inquiry in the insurance application regarding losses "sustained" during the last six years required the disclosure of the *Armitage* lawsuit which was already pending against Home, and that Home's failure to disclose the lawsuit now bars any recovery. If a loss arising from liability is "sustained" when the misconduct occurs, as I propose, then the *Armitage* loss had in fact already been sustained when Home filled out the application. I also believe that, even under the majority's reasoning, the request for information concerning losses was sufficiently clear to place Home on notice that Aetna wanted information about pending or potential claims. I would therefore hold un-

der either approach that Home's response was clearly inaccurate and should bar recovery.[18]

The majority, however, rejects Aetna's claim by effectively rewriting Utah Code Ann. § 31–19–8(1) (1974) which provides:

> Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless:
>
> (a) fraudulent; or
>
> (b) material either to the acceptance of the risk, or to the hazard assumed by the insurer; or
>
> (c) the insurer in good faith either would not have issued the policy or contract, or would not have issued, reinstated, or renewed it at the same premium rate, or would not have issued, reinstated, or renewed a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

As the majority correctly indicates, the issue is whether Home had a duty under the statute to disclose in its application for the Aetna bond the material fact that it was being sued for over one million dollars because of the dishonest conduct of an employee. The majority erroneously concludes that Home had no such duty because Aetna failed to explicitly inquire about pending cases.

By focusing only on the duty to provide information specifically requested in the application, the majority only considers

---

**18.** The application contained the following warranty by Home that it did not know of any dishonesty committed by any of the employees listed in the application.

The present officers and employees of the insured, of whom a complete list at this time, with positions held, is given above, have to the best of the insured's knowledge and belief, while in the service of the insured always performed their respective duties honestly. There has never come to its notice or knowledge any information which in the judgment of the insured indicates that any of the said officers and employees are dishonest.

The facts in this case indicate that Home knew prior to the application for insurance that Elaine Reese, one of the employees listed in the application, had committed dishonest acts by backdating the loan documents at Glad's direction. "A fraudulent misrepresentation in such an application that the insured's employees have been faithful is deemed material to the risk undertaken by the insurer and renders that bond void ab initio." *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Surety Co.,* 427 F.2d 862, 870 (4th Cir.1970) (interpreting same warranty). Inasmuch as Aetna did not pursue a claim of misrepresentation based on this provision, we have not addressed it on appeal.

"misrepresentations," "concealments of fact," and "incorrect statements." These are the possible types of affirmative responses to inquiries in an application covered by the statute. The majority, however, totally ignores "omissions" which the statute also covers. By including omissions, the statute indicates that an applicant has a duty to disclose more than what the application specifically requests. The statute clearly provides that Home may be barred from recovery if it omits facts that are "material . . . to the hazard assumed by the insured." The majority today holds, however, that an applicant for insurance may omit critical and obviously relevant information if the insurer fails to explicitly request such information. In other words, the majority removes the term "omission" from the statute by holding that an omission is a legal impossibility. I believe such rewriting of an unambiguous statute is contrary to the legislative intent and outside of the ambit of our judicial authority.

An applicant for fidelity insurance has a duty to provide material information in its application, such as pending claims against the insured, even if not directly requested to provide such information. It is true that, in general, the insurer is the expert in risk assessment and therefore has a duty to make inquiries that it feels are relevant to the assessment of risk. That does not mean however, that a sophisticated purchaser of insurance, such as Home, may turn a blind eye to the obvious. This case is not in a gray area where the *Armitage* suit *might* have been relevant.

In interpreting section 31–19–8(1), the Utah Supreme Court has indicated that a misrepresentation is "material if it diminishes the insurer's opportunity to determine or estimate its risk." *Berger v. Minnesota Mutual Life Ins. Co.*, 723 P.2d 388, 391 (Utah 1986). It is blatantly obvious that a potential claim for over one million dollars, already known of by the applicant, affects the "hazard assumed by the insured." Insurance companies set their premiums based on the possibility of an event occurring. One of the assumptions an insurer makes when issuing a fidelity bond is that the applicant does not already have claims pending against it. The fact that there is already a million dollar claim pending against an applicant obviously skews the probabilities of there being a claim against the policy. Not knowing about the possible claim prevents the insurer from accurately determining or estimating its risk. Inasmuch as pending claims obviously affect the hazard being assumed by the insurer and there is no need to "speculate" whether a pending lawsuit is relevant, I would hold that applicants for fidelity insurance have a duty under section 31–19–8(1) to disclose any pending claims or be barred from recovery on such claims.

The majority's conclusion is also contrary to the common law duty of disclosure as it relates to fidelity bonds.

> [I]t may be said to be a fundamental principle of the law of fidelity guaranty that if dishonesty of an agent, whose fidelity was guaranteed under a bond, exists before or at the time the surety bond becomes bound thereby, and the principal conceals it from the surety at the time of obtaining the fidelity bond, the surety is not liable for the losses resulting therefrom; . . . [T]he mere nondisclosure of the circumstances affecting the situation of the parties which are material for the surety to be acquainted with and are within the knowledge of the person obtaining the surety bond, is undue concealment even though not willful or intentional or with a view to any advantage to himself.

*West Am. Fin. Co. v. Pacific Indemnity Co.*, 17 Cal.App.2d 225, 61 P.2d 963, 968 (1936).

> One who becomes surety for another must ordinarily be presumed to do so upon the belief that the transaction between the principal parties is one occurring in the usual course of business of that description, subjecting him only to the ordinary risks attending it; and the party to whom he becomes a surety must be presumed to know that such will be his understanding, and that he will act upon it, unless he is informed that there are some extraordinary circumstances af-

fecting the risk. To receive a surety known to be acting upon the belief that there are no unusual circumstances by which his risk will be materially increased, well knowing that there are such circumstances, and having a suitable opportunity to make them known, and withholding them, must be regarded as a legal fraud, by which the surety will be relieved from his contract.

*American Surety*, 170 U.S. 133, 18 S.Ct. at 559 (quoting *Bank v. Cooper*, 36 Me. 179, 197 (1850)).

Th[e] rule imposes an absolute duty upon the obligee to volunteer disclosure of all facts materially affecting the risk to the surety on a fidelity bond. Irrespective of motive or intent, mere non-disclosure of facts known by the obligee which materially affect the surety's risk, such as a prior dishonesty of the principal on the fidelity bond, therefore discharges the surety.

*Sumitomo Bank of California v. Iwasaki*, 70 Cal.2d 81, 73 Cal.Rptr. 564, 568, 447 P.2d 956, 960 (1968) (citations omitted).

The majority misinterprets the cases upon which it relies in holding that Home had no duty to disclose the pending lawsuit. In *United States Fidelity & Guar. Co. v. Howard*, 67 F.2d 382 (5th Cir.1933) *cert. denied* 291 U.S. 663, 54 S.Ct. 439, 78 L.Ed. 1054, *reh. denied* 291 U.S. 648, 54 S.Ct. 457, 78 L.Ed. 1043 (1934), the insurer asked how much money a vice president owed the bank, but did not ask whether the vice president had endorsed any loans made by the bank. The bank later collapsed and it was discovered that the vice president had systematically siphoned off bank assets through bogus loans he had endorsed. It was determined that at the time the bond was applied for the vice president had endorsed over $42,000 worth of valueless loans. The insurer claimed the bank could not recover because the bank did not disclose the endorsements in the application. The court rejected the argument, reasoning that the information could not be deemed material by the insurer because no such information was ever requested in the application. In the *Howard* case, however, there was no indication that

the bank knew of the dishonest conduct or knew of any pending loss when it applied for the loan. The endorsements, in and of themselves, were not dishonest on their face. At best, the large amount of loans endorsed by the vice president was an indication that there might have been an excessive amount of risk attached to the bond that warranted additional investigation. The holding of *Howard* is simply that neutral information that *might* indicate something *may* be amiss and that further inquiry *might* be necessary before issuing the bond, must be expressly requested before its omission would bar recovery. In the present case, however, Home knew of both the alleged dishonesty and the *Armitage* lawsuit and that the lawsuit could lead to a large claim against the bond.

In *State v. United Pacific Ins. Co.*, 26 Wash.App. 68, 612 P.2d 809 (1980), the insured school district did not disclose that an employee had previously been charged with first-degree forgery as a result of a non-work incident. Contrary to the majority's characterization of the holding in that case, the Washington Court of Appeals expressly refused to adopt an absolute rule that there was no duty on the part of the applicant to have provided the information. Instead, it held that the employee was covered despite the nondisclosure because the insurance company had not relied on the application and therefore had not been misled by the nondisclosure. (The insurance company did not even require the application form to be completed.) In the present case there is no serious question that Aetna was misled by the nondisclosure of a major potential claim.

A duty to disclose pending claims simply ensures that there will be a true meeting of the minds. If Home's expectation was that the *Armitage* loss, if any, would be covered by the policy, and if Aetna charged a premium based on a belief that there were no claims already pending that would need to be covered under the policy, then there was no meeting of the minds. If there was no meeting of the minds, there could be no coverage.

I do not accept the majority's conclusion that a rule requiring disclosure would "require an insurance applicant to affirmatively convince an insurer to not issue the applied-for policy." The fact that there is a claim pending against the insured is a "material fact" upon which an insurer is "clearly entitled to be informed before it could intelligently decide whether under the existing conditions it would assume the risk to be imposed upon it by the fidelity bonds." *West Am. Fin. Co.*, 61 P.2d at 968. The disclosure of pending claims would simply facilitate a meeting of the minds. As a matter of public policy, we should encourage full disclosure rather than permit a party to benefit from its own silence.

By including the term "omissions," section 31-19-8(1) merely codifies this contractual principal as a statutory duty. I would therefore hold that Home's failure to disclose the pending lawsuit violated its duty to disclose all facts material to the hazard assumed by Aetna and therefore bars Home from seeking recovery under the bond.

## V. OFFSET OF DAMAGES

Before entering into the loans with the borrowers, Home had granted a loan to Affleck/AFCO directly. Affleck, however, was not repaying the loan. Home therefore instructed Affleck that once the borrowers gave the loan proceeds to him, he was to immediately return the proceeds to Home as payment against his original loan. Home even went so far as to place restrictive endorsements on the back of the loan proceed checks thereby preventing Affleck from cashing the checks and guaranteeing the return of the proceeds to Home. Aetna claims that by requiring Affleck to use the loan proceeds to pay off his already defaulted loan, Home effectively shifted the loss it was bound to incur under Affleck's loan to the borrowers' loans. Since a loss under the Affleck loan would not have been covered by this bond, Aetna claims it was entitled to offset the amount of loss sought by Home by the amount of loan proceeds actually returned to Home.

Home therefore did not suffer any actual loss when it had in fact received the very loan proceeds it claimed were lost.

The majority erroneously dismisses Aetna's claim because it mischaracterizes the offset issue as a question of liability that the jury should have determined. The parties expressly reserved the determination of damages for the trial court. Whether there is an offset relates directly to the issue of the amount of damages, not to the issue of liability. In order for the trial court to make such a determination, it must consider any claimed offsets. The trial court declined to hear the claim, however, because it felt the issue involved questions of fact properly reserved for the jury. The trial court, along with Home and the majority, have failed to identify any questions of fact that the jury needed to determine before the trial court could have addressed the offset claim. In fact, there is no factual dispute as to what happened with the proceeds. The only issue was whether Aetna was entitled to an offset as a matter of law. Since no jury findings were needed to make such a legal ruling, it was perfectly logical and acceptable for Aetna to wait and pursue the offset claim after the jury had rendered its special verdicts and the trial court had found Aetna liable. To have addressed the offset issue to the jury would have been fruitless since there was no factual dispute.

Inasmuch as the trial court refused to even address the offset issue because it erroneously viewed it as the duty of the jury, that issue should be remanded for consideration by the trial court.

## VI. CONCLUSION

Any loss incurred by Home was discovered while the F & D bond was in place. The Aetna bond was never intended to cover employees that were known at its inception to have been dishonest. The Aetna bond also did not cover pending claims known to Home before the inception of the bond, but not disclosed to Aetna in the application. Aetna should not, therefore, be required to

indemnify Home for its loss in the *Armitage* case.